**UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK**
_____

UNITED STATES OF AMERICA,

       v.                                        14-CR-175-RJA
                                                  **DECISION AND ORDER**

PHILIP ZODHIATES,

                Defendant.

_____

This case is scheduled for jury selection on September 20, 2016.  The Court assumes familiarity with the case's factual and procedural background, which the Court set out in detail in a prior Decision and Order.  *See United States v. Zodhiates*, --- F. Supp. 3d ---, 2016 WL 1594558 (W.D.N.Y. 2016).  As discussed in that Decision, the Defendant, Philp Zodhiates, is charged in a two-count superseding indictment which alleges (1) that he conspired to violate the International Parental Kidnapping Crime Act (IPKCA), in violation of 18 U.S.C. § 371; and (2) that he violated, or aided and abetted a violation of, the IPKCA.  In relevant part, the IPKCA makes it a crime to "remove[] a child from the United States, or attempt[] to do so, or retain[] a child (who has been in the United States) outside the United States with intent to obstruct the lawful exercise of parental rights."  18 U.S.C. § 1204(a).  The statute defines the term "parental rights" to mean "the right to physical custody of the child—(A) whether joint or sole (and includes visiting rights); and (B) whether arising by operation of law, court order, or legally binding agreement of the parties."  *Id.* § 1204(b)(2).

The parties seek pretrial rulings on several issues.  *See* Docket No. 86 (Gov't's pre-trial memo); Docket No. 94 (Def's mtns. *in limine*); Docket No. 101 (Gov't's response to Def's mtns.).  This Decision and Order resolves the parties' motions

concerning (1) whether a person can violate the IPKCA by intending to obstruct an anticipated, but not-yet-existing, child custody order; (2) whether the jury may determine the source of any relevant parental rights; and (3) whether evidence of post-removal litigation over Janet Jenkins' parental rights is admissible.  The Court will resolve the parties' remaining pretrial motions during trial, as it becomes necessary to do so.

**1.  The Court's jury instruction on § 1204's intent element**

As noted, Zodhiates is charged both with violating the IPKCA and with conspiring to do so.  The Court addresses each count in turn.

**A.  The superseding indictment's substantive count**

The first issue on which the parties seek a ruling is how the Court will instruct the jury on § 1204's intent element.  As recounted in the Court's prior Decision and Order, the Government alleges that Zodhiates removed, or aided and abetted the removal of, IMJ from the United States in September 2009.  At that time, Lisa Miller had physical custody of IMJ, but Lisa's ex-partner, Janet Jenkins, had visitation rights.  It was not until approximately two months *after* IMJ was removed from the United States that a "Vermont family court 'concluded that Lisa's willful interference with Janet's visitation rights amounted to a real, substantial, and unanticipated change in circumstances.'" *Zodhiates*, 2016 WL 1594558, at *2 (quoting *Miller-Jenkins v. Miller-Jenkins*, 12 A.3d 768, 772 (Vt. 2010)).  Thus, it was at that time—after IMJ had been removed from the country—that the Vermont family court awarded Janet sole physical and legal custody of IMJ.  *Id.*

Zodhiates argues that § 1204 requires the Government to "prove intent to violate lawful parental rights established by court order in place as of September 2009"—the

2

date of IMJ's removal from the United States.  Docket No. 18 at 13.  The Government, by contrast, argues that a person is guilty under § 1204 not only when he or she violates a court order in place at the time of the child's removal, but that a person also violates § 1204 when he or she "remove[s] a child in order to obstruct the imminent transfer of custody."  Docket No. 25 at 21.  The Government bases its argument on the fact that § 1204's text "does not contain a temporal limitation."  Docket No. 86 at 16.

The Second Circuit has not directly addressed this issue, but it has strongly suggested that Zodhiates' interpretation of § 1204 is correct.  In *United States v. Miller*, 626 F.3d 682 (2d Cir. 2010),[1] the Second Circuit held that the district court had not abused its discretion by prohibiting the defendant from introducing evidence that she had appealed a family court order which granted her ex-husband full custody of the couple's child.

The Second Circuit identified two reasons for its decision.  First, at the time the defendant removed her child from the United States, the family court order she had appealed "*did not exist*," because her ex-husband had not sought the order until several months *after* the defendant removed her child from the United States.  *Id.* at 688 (emphasis in original).  Thus, "[h]er appeal of that order . . . could not possibly be probative of [her ex-husband's] rights *at the time* that [she] went to Canada with her son."  *Id.* (quotation marks omitted, emphasis added).  Second, the Second Circuit observed that the defendant's argument "ignores the basic principle that any 'lawful parental rights' created by the [order under appeal] came into existence when the order was *issued*.'"  *Id.* at 689 (emphasis in original).  Thus, although it is not directly on point,

---

[1]  The defendant in *United States v. Miller*, 626 F.3d 682 (2d Cir. 2010) has no relation to any of the Millers involved in this case.

*Miller* endorses the view that the only relevant parental rights under § 1204 are the rights in effect at the time a child is removed from the United States.

In response to *Miller*, the Government relies principally on the Second Circuit's unpublished decision in *United States v. Sardana*, 101 F. App'x 851 (2d Cir. 2004). In that case, the Second Circuit held that there was sufficient evidence for the jury to have found that the defendant violated § 1204 where he admitted that "his reason for surreptitiously taking his daughter to India was the expectation that the courts of that country would accord his wife fewer parental rights than the courts of New York." *Id.* at 854. The Second Circuit noted that the defendant's admission, "[b]y itself, . . . sufficed to support a reasonable jury's finding of obstructive intent." *Id.*

*Sardana*, however, does not suggest that the defendant's admission had any bearing on the *source* of the parental rights he intended to obstruct. That, of course, is the issue before the Court: whether a defendant violates § 1204 when he intends to obstruct anticipated, but not-yet-existing, parental rights. As the Second Circuit noted in *Sardana*, the parental rights the defendant intended to obstruct arose "by operation of law," 18 U.S.C. § 1204(b)(2), because New York law gives "the biological mother . . . the right to physical custody of her children unless and until this right is terminated by law." *Sardana*, 101 F. App'x at 853 (quotation marks omitted). In other words, although the defendant in *Sardana* removed his child from the United States in the hope that a foreign court would give his wife fewer parental rights, the parental rights the defendant in fact obstructed arose under New York law at the time of the child's removal. Thus, the defendant's admitted intent assumed the existence of lawful parental rights. Put

differently, *Sardana* does not suggest that an intent to obstruct anticipated parental rights is sufficient to violate § 1204.

Thus, as between *Miller* and *Sardana*—the two Second Circuit decisions relevant to the issue before the Court—*Miller* is more directly on point.  As noted, *Miller* strongly suggests that when the Government alleges that a person violated § 1204 by obstructing parental rights that arose by court order, the Government must prove that the person intended to obstruct a court order in effect at the time the defendant removed the child from the United States.  In the absence of a case directly on point (from the Second Circuit or elsewhere), the Court will follow *Miller*.  Thus, in this case, the "parental rights" at issue in the substantive IPKCA count are the visitation rights Janet Jenkins had in September 2009—not the custody rights Jenkins received following the November 2009 Vermont family court order.

The Court's conclusion is also consistent with the holding of U.S. District Judge William K. Sessions, III, who presided over an earlier trial in this case in the District of Vermont.  In that case, Judge Sessions held that, "[w]hile it is likely that many if not most parental kidnapping offenses will affect the exercise of future or anticipated parental rights because the offending parent has removed the child in violation of existing rights, the statute criminalizes the intent generally to obstruct the lawful exercise of those *existing* parental rights."  *United States v. Miller*, Crim. No. 2:11-cr-161-1, 2012 WL 3192739, at *2 (D. Vt. Aug. 7, 2012) (emphasis added).  The Court agrees with Judge Sessions that § 1204's plain language more naturally bears Zodhiates' interpretation.

The Court acknowledges, as the Government argues and as Judge Sessions noted, that this more restrictive interpretation of § 1204's intent element seems to undercut §1204's purpose.  *See* Docket No. 86 at 17.  But, as the Supreme Court has "stated time and again," "courts must presume that a legislature says in a statute what it means and means in a statute what it says there."  *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253-54 (1992).  Although § 1204 is not as clear on this issue as it could be, the statute is far from ambiguous and, as a result, it would be improper for the Court to interpret the statute by reference to Congress's unstated purpose.  *See United States v. DiCristina*, 726 F.3d 92, 96-97 (2d Cir. 2013) ("In the event that the text of a statute is not clear, a court interpreting the statute may consult the legislative history to discern 'the legislative purpose as revealed by the history of the statute.'") (quoting *Concrete Pipe & Prods. Of Cal., Inc. v. Constr. Laborers Pension Trust for S. Cal.*, 508 U.S. 602, 627 (1993)).

The Court will therefore instruct the jury on § 1204's intent element from Sand's *Modern Federal Jury Instruction* 42-20.  As Judge Sessions concluded, that instruction "adequately conveys the concept [described above], without further specifying that the statute may be violated merely by removing one's future ability to exercise anticipated parental rights."  *Id.* at *2.  The instruction which the Court expects to give as to § 1204's intent element is as follows:

> The third element the Government must prove beyond a reasonable doubt is that Zodhiates acted with the intent to obstruct the lawful exercise of Janet Jenkins' parental rights.  In this case, the term "parental rights" means Janet Jenkins' right to visit IMJ, as that right was defined by the law and courts of Vermont at the time IMJ was removed from the United States.  It does not matter whether these parental rights arose by court order, legally binding agreement of the parties, or by operation of law.  To

find that Zodhiates acted with the intent to obstruct the lawful exercise of parental rights, you must find that he acted deliberately with the purpose of interfering with Janet Jenkins' parental rights.  You may consider all of the evidence of Zodhiates' other acts in determining whether the government has proven beyond a reasonable doubt that Zodhiates acted with this intent.

Adapted from Leonard B. Sand, *Modern Federal Jury Instructions* (2014) 42-20.

Count 2 of the superseding indictment also charges that Zodhiates aided and abetted a violation of the IPKCA, in violation of 18 U.S.C. § 2.  "[A] person aids and abets a crime when," among other things, "he intends to facilitate that offense's commission.  An intent to advance some different or lesser offense is not, or at least not usually, sufficient: Instead, the intent must go to the specific and entire crime charged." *Rosemand v. United States*, 134 S. Ct. 1240, 1248 (2014).  The Court's jury instruction on aiding and abetting will, therefore, need to include an instruction on the intent element of § 1204(a)—that is, "the specific and entire crime charged." *Id.*  Thus, to ensure that the parties are fully aware of how the Court's jury instructions on intent might impact their presentation of this case, the Court informs the parties that, as to the superseding indictment's aiding and abetting charge, the Court will charge the jury using an instruction taken from Sand's *Modern Federal Jury Instructions.*  The instruction the Court expects to give is as follows:

Under the aiding and abetting statute, it is not necessary for the government to show that Zodhiates himself physically committed the crime with which he is charged in order for the government to sustain its burden of proof.  A person who aids or abets another to commit an offense is just as guilty of that offense as if he committed it himself.

Accordingly, you may find Zodhiates guilty of international parental kidnapping if you find beyond a reasonable doubt that the government has proven that another person actually committed the offense of international

parental kidnapping, and that Zodhiates aided or abetted that person in the commission of the offense.

As you can see, the first requirement is that you find that another person has committed the crime of international parental kidnapping.  Obviously, no one can be convicted of aiding or abetting the criminal acts of another if no crime was committed by the other person in the first place.  But if you do decide that an international parental kidnapping occurred with respect to IMJ, then you must consider whether Zodhiates aided or abetted the commission of that crime.

In order to aid or abet another to commit a crime, it is necessary that the defendant knowingly associate himself in some way with the crime and that he participate in the crime by doing some act to help make the crime succeed.

To establish that Zodhiates knowingly associated himself with the crime of international parental kidnapping, the government must establish that Zodhiates intended to obstruct Janet Jenkins' lawful exercise of parental rights.  I have previously instructed you on how the Government must prove intent to obstruct the lawful exercise of parental rights, and that instruction applies equally in the context of the aiding and abetting statute.

To establish that Zodhiates participated in the commission of the crime of international parental kidnapping, the Government must prove that he engaged in some affirmative conduct or overt act for the specific purpose of bringing about the crime.

The mere presence of a defendant where a crime is being committed, even coupled with knowledge by the defendant that a crime is being committed, or merely associating with others who were committing a crime is not sufficient to establish aiding and abetting.  One who has no knowledge that a crime is being committed or is about to be committed but inadvertently does something that aids in the commission of that crime is not an aider and abettor.  An aider and abettor must know that the crime is being committed and act in a way which is intended to bring about the success of the criminal venture.

To determine whether Zodhiates aided or abetted the commission of the crime of international parental kidnapping, ask yourself these questions:

Did he participate in the crime charged as something he wished to bring about?

Did he knowingly associate himself with the criminal venture?

Did he seek by his actions to make the criminal venture succeed?

If the government has proven beyond a reasonable doubt that Zodhiates did these three things, then he is an aider and abettor, and, therefore, guilty of the offense. If, on the other hand, your answer to any one of these questions is "no," then Zodhiates is not an aider and abettor, and you must find him not guilty.

Adapted from Sand, *Modern Federal Jury Instructions* 11-2.

### B. The superseding indictment's conspiracy count

The superseding indictment also alleges that Zodhiates conspired to violate the IPKCA, in violation of 18 U.S.C. § 371. The parties dispute whether and how § 1204's intent element, as the Court interpreted it above, applies to the conspiracy count. As is relevant to this case, § 371 makes it a crime to "conspire . . . to commit any offense against the United States."

Zodhiates argues that, to prove its conspiracy count, the Government "must prove a conspiracy to obstruct parental rights—that is, a conspiracy to obstruct rights created by an order in place at the time the conspiracy was allegedly formed." Docket No. 94-1 at 6. In other words, Zodhiates argues, because he could not have intended to obstruct a court order that was not in effect in September 2009, he could not have *conspired* to do so. The Government responds by arguing that, even if Zodhiates could not have conspired to violate a court order that was not in effect when IMJ was removed from the United States, he could have conspired to violate the IPKCA in two other ways:

(1) by conspiring to obstruct Janet Jenkins' visitation rights; and/or (2) by conspiring to maintain IMJ outside the United States after her removal. *See* Docket No. 86 at 19. The IPKCA makes both acts a crime. *See* 18 U.S.C. § 1204(a) (making it a crime to, among other things, "retain a child (who has been in the United States) outside the United States with intent to obstruct the lawful exercise of parental rights"); § 1204(b)(2)(A) (defining "parental rights" to "include[] visiting rights"). Thus, a person violates § 371 by conspiring to retain a child outside the United States or by conspiring to obstruct another person's visitation rights. The Government may therefore pursue these theories of the conspiracy charge. S*ee* Docket No. 86 at 19.[2]

## 2. Whether the jury may determine the source of any relevant parental rights

The Government next requests a pretrial ruling that "this Court, not the jury, should determine the source of parental rights." Docket No. 86 at 14. It is well-settled that, under the IPKCA, "'parental rights' are to be determined by reference to State law, in accordance with the Hague Convention." *United States v. Amer*, 110 F.3d 873, 878 (quoting H.R. Rep. No. 103-390, at 4 (1993)). *See also Sardana*, 101 F. App'x at 1 ("In determining what parental rights arise by operation of law, federal courts look to state law"); *United States v. Fazal-Ur-Raheman-Fazal*, 355 F.3d 40, 45 (1st Cir. 2004) (noting that the IPKCA "looks to state family law for purposes of defining 'parental rights'") (emphasis omitted); *United States v. Alahmad*, 28 F. Supp. 2d 1273, 1274 (D. Colo.

---

[2] The Government appears to change course slightly in its reply brief by arguing that Zodhiates conspired to retain IMJ outside of the United States with the intent to "obstruct a transfer of custody that would take place in the near future and that did take place within the time of the alleged conspiracy." Docket No. 101 at 7. The Government's precise theory of its conspiracy charge is, therefore, slightly confusing: It is unclear whether the Government argues (1) that Zodhiates conspired, prior to removing IMJ, to retain IMJ outside the country with the intent to obstruct a court order that was not yet in effect; (2) that Zodhiates conspired, *after* IMJ was removed, to obstruct a custody transfer order that went into effect *after* IMJ was removed; or (3) that Zodhiates conspired in some other way to retain IMJ outside the country. The Court will likely hear additional argument in this issue prior to finalizing its jury charge.

1998) ("[T]he scope and nature of . . . 'parental rights' [under the IPKCA] are determined by state law.")

Thus, the Court will not instruct the jury—nor should either party in any way suggest during trial—that the jury is to decide whether the Vermont family court orders at issue were correct as a matter of law, fact, or otherwise. The IPKCA does not give parents and other interested parties an opportunity to relitigate child custody disputes in federal court. The Government, of course, must prove the status of parental rights to IMJ at the time she was removed from the United States, but the Government need not defend the propriety of the state court decisions defining those rights. In other words, once the Government proves the status of parental rights to IMJ under Vermont law at the time she was removed from the United States, the jury must take those rights as they existed at that time.

### 3. Whether evidence of post-removal litigation concerning Janet Jenkins' parental rights is admissible

Finally, the Government requests a pretrial ruling on whether Zodhiates may introduce evidence concerning the custody litigation which followed IMJ's removal. As noted, in *United States v. Miller*, 626 F.3d 682 (2d Cir. 2010), the Second Circuit held that the district court did not abuse its discretion by prohibiting the defendant from introducing evidence that she had appealed a family court order which granted her ex-husband full custody of the couple's child. *Miller* largely controls here. Based on the Court's current understanding of the facts in this case, evidence of post-removal litigation appears to have no relevance to the issue of Zodhiates' intent at the time IMJ was removed from the United States. Such litigation could, "at most, express . . . *disagreement with*" the parental rights in force at the time of IMJ's removal. *Id.* at 689

11

(emphasis in original).  But "disagreement with those rights . . . [is] neither relevant to their existence during the period of the indictment nor a legal defense to the crime charged."  *Id.*

Based on the Court's current understanding of the facts, it is unclear whether evidence of post-removal litigation would be entirely irrelevant to any issue that may arise in this case.  However, even if such evidence were relevant to some issue, it appears (again, based on the Court's current understanding of the facts), that such evidence would be unnecessarily confusing, misleading, or cumulative when compared to its probative value.  *See* Fed. R. Evid. 403.  Evidence of post-removal litigation would therefore appear to be inadmissible.

## CONCLUSION

For the reasons stated above, the Court will instruct the jury on § 1204's intent element as described above.  Further, the Court will not instruct the jury to decide whether the Vermont state court orders at issue were correct.  Finally, based on the Court's current understanding of the facts, evidence of post-removal litigation concerning parental rights to IMJ appears to be inadmissible.

**SO ORDERED.**

Dated: September 14, 2016                              *s/Richard J.Arcara*
      Buffalo, New York                         HONORABLE RICHARD J. ARCARA
                                                   UNITED STATES DISTRICT JUDGE