**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**
_____

UNITED STATES OF AMERICA,

          v.                                   14-CR-175-RJA
                                                      **DECISION AND ORDER**

PHILIP ZODHIATES,

                    Defendant.
_____

      This case is before the Court on Defendant Philip Zodhiates's renewed motion

for a judgment of acquittal, pursuant to Federal Rule of Criminal Procedure 29, as well

as his motion for a new trial, pursuant to Rule 33.  _See_ Docket No. 127 (Zodhiates Br.)

For the reasons stated below, both motions are denied.

## BACKGROUND

### A.  The evidence introduced at trial

      After a seven-day jury trial, Zodhiates was convicted of conspiracy, in violation of

18 U.S.C. § 371; and international parental kidnapping, in violation of 18 U.S.C. §§ 1204

and 2.  The Court assumes familiarity with the evidence introduced at trial and therefore

recites only the facts necessary to provide background for Zodhiates's post-trial

motions. Further, because the jury found Zodhiates guilty of both counts in the

superseding indictment, the Court recites the facts "in the light most favorable to the

government and draw[s] all reasonable inferences in its favor."  _United States v._

_Guadagna_, 183 F.3d 122, 125 (2d Cir. 1999).

      Stated very generally, the evidence introduced at trial showed that, in 2009, Lisa

Miller and Janet Jenkins were in the midst of a bitter and lengthy custody dispute over

their daughter, Isabella Miller-Jenkins.[1]  From the time the custody litigation began, Miller had custody of Isabella, while Jenkins had visitation rights.[2]

Beginning in 2008 (*see* Def. Ex. 4) and continuing throughout 2009, Zodhiates became aware of Miller and Jenkins's custody dispute.  Specifically, in the months leading up to September 2009, Zodhiates received a number of emails from both Miller's supporters (some of which were sent on Miller's behalf) and Liberty Counsel, a public interest law firm representing Miller in the custody litigation.  The Court describes many of those emails below, but in general, they provided relatively detailed updates on the status of the custody litigation.  Many emails, for instance, discussed Jenkins's scheduled visits with Isabella, as well as Jenkins's efforts to obtain custody of Isabella.

As September 2009 approached, it appeared increasingly likely to those following the litigation that Judge William Cohen, the Vermont Family Court Judge presiding over Isabella's custody dispute, would transfer custody of Isabella from Miller to Jenkins.  Zodhiates learned this fact by way an August 27, 2009 email.  *See* Gov't Ex. 34.  Less than two weeks later, however, Judge Cohen deferred ruling on Jenkins's motion to transfer custody; instead, he ordered a visit between Jenkins and Isabella for the end of September.  Zodhiates learned this fact, again, by way of email.  *See* Gov't Ex. 35.

---

[1]  The Court has previously summarized Lisa Miller's relationship with Janet Jenkins, as well as the couple's multi-year custody dispute over Isabella.  *See United States v. Zodhiates*, 166 F. Supp. 3d 328, 331-33 (W.D.N.Y. 2016).  The evidence introduced at trial was consistent with the Court's summary.

[2]  Isabella's guardian *ad litem* in the Vermont litigation, Tara Devine, testified at trial as both a fact witness and an expert witness.  Ms. Devine is a Vermont attorney who has practiced family law for over a decade.  At trial, she defined the term "custody" to mean "sole legal and physical parental rights and responsibilities, which means [Miller] has the right to determine the daily care, daily routine of the child. She also gets to determine the child's educational needs and choices, the medical, dental, religious and travel decisions and anything else that affects the child, subject to Janet Jenkins' parent-child contact." Tr. 305:7-14.  (Except where noted, references to "Tr." in this Decision and Order refer to the trial transcript.)  Ms. Devine also testified that the terms "visitation rights" and "parent-child contact" mean "[e]xactly the same thing."  Tr. 224:13-17.

On September 21, 2009—just days before Jenkins was to have her court-ordered visit with Isabella—Zodhiates drove Miller and Isabella from their home in Virginia to Buffalo, New York.   Once in Buffalo, Miller and Isabella (who were now dressed in Mennonite garb) took a taxi to Niagara Falls, Ontario.   From Niagara Falls, Miller and Isabella were driven to Toronto.   And from Toronto, Miller and Isabella took the first in a series of flights that ultimately brought them to Managua, Nicaragua.

The evidence also showed that, following Isabella's removal, Zodhiates helped Miller and Isabella settle in Nicaragua.   For instance, shortly after Isabella's removal, Zodhiates coordinated with others to remove a number of Miller's and Isabella's personal items from their apartment.   *See* Gov't Exs. 41, 44, 47a.   And in November 2009, Zodhiates arranged for an acquaintance who was traveling to Nicaragua to bring with him two suitcases of supplies that were to be delivered to Miller.   *See* Gov't Ex. 49a.

### B.  The charges in the superseding indictment

Zodhiates went to trial on a two-count superseding indictment.   Count 1 charged that Zodhiates and others conspired to violate the International Parental Kidnapping Crime Act (IPKCA), 18 U.S.C. § 1204, by removing Isabella from the United States and/or retaining her outside the United States.   Count 2 charged Zodhiates with substantively violating, or aiding and abetting a violation of, the IPKCA.

The central dispute at trial was whether the Government proved Zodhiates's intent beyond a reasonable doubt.   The IPKCA makes it a crime to remove a child from the United States, or to retain a child outside the United States, "with intent to obstruct the lawful exercise of parental rights."   18 U.S.C. § 1204(a).   The IPKCA defines the

term "parental rights" as "the right to physical custody of the child—(A) whether joint or sole (and includes visiting rights); and (B) whether arising by operation of law, court order, or legally binding agreement of the parties."  18 U.S.C. § 1204(b)(2).

Because Jenkins' parental rights changed in late 2009—when the most significant conduct in this case occurred—the Court issued two pretrial rulings that identified the particular parental rights at issue for each count in the superseding indictment.  As to Count 1 (the conspiracy count), the Court held that "[t]he Government may argue to the jury that Zodhiates conspired to retain [Isabella] outside the United States with the intent of obstructing an anticipated, but not-yet-existing, custody order"—that is, Judge Cohen's November 20, 2009 order transferring custody of Isabella to Jenkins.  *United States v. Zodhiates*, 2016 WL 4976216, at *3 (W.D.N.Y. Sept. 19, 2016).  And as to Count 2 (the substantive count), the Court held that "the Government must prove that [Zodhiates] intended to obstruct a court order in effect at the time [he] removed [Isabella] from the United States. . . . Thus, . . . the 'parental rights' at issue in [Count 2] are the visitation rights Janet Jenkins had in September 2009—not the custody rights Jenkins received following the November 2009 Vermont family court order" transferring custody.  *United States v. Zodhiates*, 2016 WL 4771007, at *3 (W.D.N.Y. Sept. 14, 2016).

## DISCUSSION

Zodhiates first renews his motion for a judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29.  He also moves for a new trial pursuant to Rule 33.  The Court addresses each motion in turn.

### A. Rule 29 motion for a judgment of acquittal

Rule 29 imposes a heavy burden on a defendant challenging his conviction following a jury trial. A court may enter a judgment of acquittal "only if the evidence that the defendant committed the crime alleged is nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt. In applying these principles, [the Court] review[s] all of the evidence presented at trial in the light most favorable to the government, crediting every inference that the jury might have drawn in favor of the government." *United States v. Facen*, 812 F.3d 280, 286 (2d Cir. 2016) (quotation marks and citations omitted). In other words, Rule 29 requires that the Court give great deference to a jury's findings as to "the weight of the evidence and the reasonable inferences to be drawn" from that evidence. *Id.* (quotation marks omitted). This means that a judgment of acquittal is not warranted simply because the Government's case did "not exclude every possible hypothesis of innocence." *Id.* (quotation marks omitted). Instead, "where either of the two results, a reasonable doubt or no reasonable doubt, is fairly possible, the court must let the jury decide the matter." *Id.* (quotation marks and brackets omitted).

Zodhiates argues that the Court should enter a judgment of acquittal because, in his view, no reasonable jury could have found beyond a reasonable doubt that he knew of Jenkins's parental rights, "understood what those rights were, and intended to obstruct those rights." Zodhiates Br. at 2.[3] Zodhiates's argument is essentially that the

---

[3] As part of his Rule 29 motion, Zodhiates argues that the Government was required to prove that he intended to obstruct Jenkins's exercise of the parental rights she had under Virginia law, rather than Vermont law. *See* Zodhiates Br. at 3 (citing *United States v. Amer*, 110 F.3d 873, 877-79 (2d Cir. 1997)). This argument is largely identical to an argument Zodhiates makes in support of his Rule 33 motion. *See id.* at 10-14. The Court addresses the argument in detail in its discussion of Zodhiates's Rule 33 motion. For the reasons stated in that section of this Decision and Order, the Court's decision on Zodhiates's Rule

custody litigation between Jenkins and Miller was so complex that no reasonable jury could have found that a non-attorney (such as Zodhiates) knew or understood what parental rights, if any, Jenkins had, much less intended to obstruct those rights.

This argument was central to Zodhiates's defense at trial. In support of his claim, Zodhiates introduced a number of emails he received in 2008 and 2009 updating him on the custody litigation. Some emails gave Zodhiates updates in minute detail; others provided more general reports. Nearly all of the emails, however, mentioned or described, in some manner, Miller and Jenkins's parental rights. But the emails' descriptions of Miller and Jenkins's parental rights were not always clear. Rather, many of the emails Zodhiates introduced were, from a layman's perspective, possibly equivocal or ambiguous on the question whether Jenkins had any valid parental rights.[4] In contrast, a handful of the emails Zodhiates introduced clearly stated or suggested

---

29 motion is premised on the understanding that the Government was required to prove that Zodhiates intended to obstruct Jenkins's exercise of the parental rights she had under Vermont law.

[4] *See, e.g.*, Def. Ex. 4 (discussing a coming argument before the Virginia Supreme Court, and noting that, "[i]f the Virginia Supreme Court decision clashes with the Vermont Supreme Court, which granted parental rights and frequent visitation to Janet, who lives in Vermont, the case will automatically be heard by the United States Supreme Court"); Def. Ex 9 ("The [Vermont family court] judge will be considering what to do regarding custody and visitation of [Lisa Miller's] daughter, Isabella."); Def. Ex. 11 ("At the hearing [in Vermont], an individual who was appointed by the judge to make recommendations in the case gave her opinion that changing custody would be harmful to Isabella. The judge allowed Lisa to retain custody, but ordered unsupervised visitation for four days in March, over the Memorial Day holiday and for five days this summer. . . . [T]he judge has refused to give custody of Isabella to Janet."); Def. Ex. 14 (noting that the Vermont family court judge "allowed Lisa to retain custody but ordered unsupervised visitation for four days in March, over the Memorial Day holiday and for five weeks in the summer" and later noting that "the judge has refused to give custody of Isabella to Janet"); Def. Ex. 26 ("Although the court ruled that Lisa had violated a Vermont judge's visitation order, no fines were assessed against her. The court ordered that Lisa pay $100 per day for pending visitation orders issued in Vermont, but there are no pending visitation orders at this time"); Def. Ex. 37 (in post-removal email, noting that Judge Cohen "issued a temporary order, dated September 11, directing visitation from Friday morning Sept. 25 until Sunday evening Sept. 27," but also noting a pending Virginia appeal asking whether "the U.S. Constitution . . . require[s] Virginia to enforce [Vermont] orders"); Def. Ex. 41 (in post-removal email, discussing a pending appeal in Virginia regarding "whether Virginia must enforce the terms of the [Vermont] civil union order," and noting that "[t]he Vermont trial court recently ordered that Lisa must send her own daughter to live with Janet, despite the fact that the same court has repeatedly found Lisa to be a fit parent of Isabella").

that Vermont courts had granted Jenkins some form of parental rights.[5]  In addition to these emails, Zodhiates introduced evidence—primarily through Isabella's guardian *ad litem* in the Vermont litigation—that the custody litigation in both Vermont and Virginia was complicated, contentious, and drawn out.  In short, Zodhiates correctly observes that, viewed in its entirety, Isabella's custody litigation was far from simple: the evidence introduced at trial showed that the litigation had gone on for nearly six years by the time of Isabella's removal; it involved multiple proceedings and appeals; it raised complex legal questions on which different courts disagreed; and, at least until 2006 (*see Miller-Jenkins v. Miller-Jenkins*, 637 S.E.2d 330, 337 (Va. Ct. App. 2006)), it resulted in what the Vermont Supreme Court described as "an interstate parental-rights contest" between Vermont and Virginia courts.  *Miller-Jenkins v. Miller-Jenkins*, 912 A.2d 951, 957 (Vt. 2006).

But even given the confusing state of the custody litigation, the Government introduced evidence from which a reasonable jury could have inferred that Zodhiates knew, prior to Isabella's removal, that Jenkins had both visitation rights and a strong chance of winning custody of Isabella.  The Government's most direct evidence of Zodhiates's state of mind was a January 2009 email in which Zodhiates suggested he had both knowledge of, and intent to obstruct, Jenkins's parental rights.  In the email, Zodhiates sent William Sidebottom (who, at the time, was an employee of Miller's counsel, Liberty Counsel) an article reporting that a Virginia family court judge had

---

[5]  *See, e.g.*, Def. Ex. 10 ("LEGAL UPDATE: Hearing is still going on in Vermont.  I'm told that the judge has denied Lisa's motion to reduce or stop visitation.  Now the judge is hearing Janet's request that she be given custody."); Def. Ex. 18/Gov't Ex. 29 (April 2009 email noting that "Judge Cohen insisted on a VT visit prior to the summer visit"; that "Judge Cohen let stand the Memorial Day visit in VA"; and that "Judge Cohen said there will be a hearing in VT sometime prior to the Memorial Day visit to decide when the make-up VT visit will be").

recently "ordered Miller to allow Jenkins a three-day unsupervised visit with Isabella."

Gov't Ex. 26 at 2.  Zodhiates's email asked Sidebottom:

> Is there no legal recourse now for Lisa Miller? (see the attached article from WND)
>
> If not, I'd like to suggest to her some personal options, which LC probably should not or would not want to know about.
>
> In other words, if there is nothing else LC can do for her, I'd like her contact information.

*Id.*  The Government also introduced a number of other emails from which a reasonable jury could have inferred that Zodhiates knew of Jenkins's actual and anticipated parental rights.  In particular, the Government introduced emails sent to Zodhiates that referenced Judge Cohen having ordered visitation for five weeks in July and August 2009 (Gov't Ex. 32); Judge Cohen declining to transfer custody of Isabella to Jenkins, but "ma[king] a new order for unsupervised visitation for the end of September" (Gov't Ex. 35); and Judge Cohen "ma[king] it very clear that he would most likely rule in favor of" Jenkins's motion to transfer custody at a status conference in early September.  Gov't Ex. 34.  *See also* Gov't Ex. 29/Def. Ex. 18 (email discussing Judge Cohen's decision to allow visits in May 2009 and noting that "[a]t the next hearing . . . more fact finding information will be taken to decide if a transfer of custody will take place").

In light of the Government's evidence, Zodhiates has not met his "heavy burden," *United States v. Si Lu Tian*, 339 F.3d 143, 150 (2d Cir. 2003) (quotation marks omitted), to show that the evidence is insufficient to sustain his convictions.  The evidence introduced at trial—viewed, as it must be, "in its totality, in a light most favorable to the government," and with "all inferences [drawn] in favor of the prosecution," *United States*

*v. Irving*, 452 F.3d 110, 117 (2d Cir. 2006)—provided a more-than-sufficient basis for the jury to convict on both counts.  In particular, the emails described above provided the jury with evidence from which it could have reasonably inferred 1) that Zodhiates knew Jenkins had the right to visit Isabella; and 2) that by September 2009, Zodhiates also knew that Judge Cohen would likely transfer custody of Isabella from Miller to Jenkins.  To be sure, the jury also heard evidence suggesting that a layman might have had a difficult time understanding the custody litigation.  But resolving any conflict between that evidence and the Government's evidence is one of the jury's fundamental duties.  *See United States v. Guadagna*, 183 F.3d 122, 129 (2d Cir. 1999) ("Rule 29(c) does not provide the trial court with an opportunity to substitute its own determination of the weight of the evidence and the reasonable inferences to be drawn for that of the jury.") (quotation marks and ellipsis omitted).  Put differently, the Court may not set aside the jury's verdict simply because the jury was presented with evidence supporting both parties.  Rather, if there is evidence from which "*any* rational trier of fact could have found" Zodhiates's intent beyond a reasonable doubt, *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original), Rule 29 does not allow the Court to interfere with the way in which the jury resolved the competing inferences that could be drawn from that evidence.  This is particularly true when, as in this case, one of the central disputes at trial concerns a defendant's knowledge "because knowledge can be—and usually must be—proved by reasonable inferences drawn from circumstantial evidence."  *United States v. Fagan*, --- F. App'x ---, 2017 WL 219081, at *1, (2d Cir. Jan. 19, 2017) (citing *McFadden v. United States*, 135 S. Ct. 2298, 2306 n.3 (2015)).

The Government's documentary evidence also provided the jury with an evidentiary basis which, when combined with other evidence, allowed the jury to infer Zodhiates's intent.  Specifically, the Government introduced evidence about the timing of, and the circumstances surrounding, Isabella's removal from the United States and her retention in Nicaragua.  That evidence provided further circumstantial proof from which a reasonable jury could have inferred that Zodhiates intended to obstruct Jenkins's parental rights.  *See Guadagna*, 183 F.3d at 130 ("[A] jury may bring to its analysis of intent on individual counts all the circumstantial evidence it has received on the scheme and the purpose of the scheme in which the defendant allegedly participated.")  In particular, the timing of Isabella's removal provided the jury with strong circumstantial evidence that Zodhiates's intent in aiding Isabella's removal was to frustrate Jenkins's ability to visit Isabella and to render meaningless Judge Cohen's anticipated order transferring custody.  Further, efforts by Zodhiates and the other coconspirators to maintain secrecy, both before and after the removal, offered the jury circumstantial evidence from which it could have reasonably inferred that Zodhiates understood his conduct to be illegal.  For instance, phone records and testimony introduced by the Government showed that, on September 20 (the day before the removal), Zodhiates and Miller did not speak directly; rather, they communicated using Miller's father as an intermediary.  In addition, an email Zodhiates sent his daughter shortly after Isabella's removal contained an attachment requesting art supplies and snack foods "for her."  Gov't Ex. 47a.  In the attachment, the names "Philip" and "Ken" (among others) had clearly been blacked out with marker.  *Id.*  Similarly, when he arranged for an acquaintance to transport suitcases full of supplies to Nicaragua,

Zodhiates referred to Miller not by her name, but as "Sarah," "a lady that works with [Christian Aid Ministries] in Managua."  Gov't Ex. 48.  *See also* Gov't Ex. 49b.  Finally, in December 2009, one of Zodhiates's employees sent Zodhiates an email with an update on the custody litigation.  The email noted that "Lisa and Isabella Miller are nowhere to be found, just days before the court-mandated transfer of custody."  Gov't Ex. 50a. Zodhiates responded by asking his employee: "Did you write this?"  *Id.*  One minute later, Zodhiates sent a second email: "If so, it is best to not publicly acknowledge that you've met them."  Gov't Ex. 50b.  This evidence of secrecy, in addition to the documentary evidence described above, was sufficient to allow a reasonable jury to infer that Zodhiates's intent in aiding Isabella's removal was to frustrate Jenkins's parental rights.

To be sure, Zodhiates offered evidence of innocent explanations for some of this conduct.  He also offered character evidence that, he argued, showed his intent was to help Miller, and not to obstruct Jenkins's parental rights.  But when the Government proves an element of a crime circumstantially—as it must almost always do when it proves a defendant's intent—the Government "need not 'exclude every reasonable hypothesis other than that of guilt.'"  *Guadagna*, 183 F.3d at 130 (quoting *Holland v. United States*, 348 U.S. 121, 139 (1954)).   And when the Government offers circumstantial evidence of intent from which a reasonable jury could find the defendant guilty beyond a reasonable doubt—as the Government did in this case—Rule 29 does not permit the Court to set aside the jury's view of that evidence.

Thus, because Zodhiates has not met Rule 29's heavy burden, his renewed motion for a judgment of acquittal is denied.

11

### B.  Rule 33 motion for a new trial

The standard for a new trial under Rule 33 is different than the standard for a judgment of acquittal under Rule 29.  Rule 33 allows a court to "vacate any judgment and grant a new trial if the interest of justice so requires."  Fed. R. Crim. P. 33(a).  "[B]y its terms," Rule 33 provides district courts with "broad discretion to set aside a jury verdict and order a new trial to avert a perceived miscarriage of justice."  *United States v. Ferguson*, 246 F.3d 129, 133 (2d Cir. 2001) (quotation marks and ellipsis omitted). The fundamental question underlying a Rule 33 motion is, then, straightforward, if not always easy to answer: whether "an injustice has been done."  *United States v. Sanchez*, 969 F.2d 1409, 1414 (2d Cir. 1992).  Put differently, the Court must have "a real concern that an innocent person may have been convicted."  *Id*.

Zodhiates makes four arguments for a new trial.  The Court addresses each in turn.

### 1.  Location information obtained by grand jury subpoena

Zodhiates first moves for a new trial because, he argues, the cell phone records introduced at trial were obtained in violation of the Fourth Amendment.  Specifically, Zodhiates argues that the Government conducted an illegal Fourth Amendment "search" when it obtained those records with a grand jury subpoena, rather than a warrant.  The Court rejected this argument in pretrial litigation, *see United States v. Zodhiates*, 166 F. Supp. 3d 328, 333-40 (W.D.N.Y. 2016), and Zodhiates has not identified any intervening authority that would lead the Court to reconsider its earlier decision.[6]  Zodhiates's Rule 33 motion on this ground is therefore denied.

---

[6]  Since the Court filed its Decision and Order denying Zodhiates's suppression motion, the Second Circuit has issued two decisions that touch on the question raised by Zodhiates's motion.  Neither case,

### 2. Exclusion of character evidence

Zodhiates next moves for a new trial because the Court excluded evidence of specific acts of Zodhiates's good character throughout the trial.

The principle evidentiary disputes in this case were whether and how Zodhiates could introduce character evidence. Before the parties gave their opening statements, the Court issued a ruling that set forth the parameters for introducing character evidence during the trial. The Court first ruled that Zodhiates's character traits of unconditional generosity and charity "may be at least marginally relevant to the issue of intent in this case."[7] Docket No. 114, Tr. of Sept. 21 Oral Ruling ("Sept. 21 Tr.") 3:25 - 4:1. The Court noted that this conclusion was premised on the Government having suggested in its pretrial memorandum that it would put Zodhiates's motive at issue by arguing that he acted out of religious bigotry. *See* Docket No. 86 at 1. In response, Zodhiates argued that he was motivated not by bigotry, but by a charitable desire to help Miller. Because a defendant's motive may have a bearing on his intent, and because intent is an element of the crimes charged in this case, the Court ruled that

---

however, provides guidance on the Fourth Amendment issue present here. In the first case, the Second Circuit declined to "resolve th[e] important and complex Fourth Amendment question" raised by Zodhiates's motion because the Second Circuit found that exigent circumstances justified the government's conduct. *United States v. Caraballo*, 831 F.3d 95, 102 (2d Cir. 2016), *cert. denied*, 2017 WL 69446 (Jan. 9, 2017). In the second case, the Second Circuit interpreted the term "other information" in 18 U.S.C. § 2702(c)(4) (a provision of the Stored Communications Act) to include "the location of a customer's cell phone." *United States v. Gilliam*, 842 F.3d 801 (2d Cir. 2016). As in *Caraballo*, however, the Second Circuit in *Gilliam* declined to address whether the government conducts a Fourth Amendment "search" when it obtains aggregated cell phone location information. Instead, the court assumed for purposes of its decision that a cell phone user has a reasonable expectation of privacy in such information. *Id.* 804 at n.2. The court then concluded that exigent circumstances justified warrantless GPS tracking of the defendant's cell phone.

[7] In its pretrial memorandum, the Government acknowledged that, "[i]n a criminal case, evidence of a trait of being law-abiding is generally relevant." Docket No. 86 at 32. The Court therefore also allowed Zodhiates to introduce evidence of his character trait for law abidingness.

Zodhiates's character traits for law abidingness and unconditional charity and generosity were "pertinent." Fed. R. Evid. 404(a)(2)(A).

The Court then turned to the "method by which [Zodhiates] may introduce character evidence." Sept. 21 Tr. 4:22-23. The Court first ruled that Federal Rule of Evidence 405(a) would "provide the primary method by which the defendant may introduce evidence of pertinent character traits in this case." *Id.* 5:2-4. Rule 405(a) allows a party to introduce character evidence in the form of "testimony about the person's reputation or by testimony in the form of an opinion." The Court, however, rejected Zodhiates's argument that he could introduce evidence of specific instances of his generosity and charity under Rule 405(b), which permits such character evidence "[w]hen a person's character or character trait is an essential element of a charge, claim, or defense." Fed. R. Evid. 405(b). *See also* Sept. 21 Tr. 5:5-16. The Court observed that the charges in the superseding indictment "are not charges which make the defendant's character an essential element." *Id.* 5:21-22. In support of this conclusion, the Court pointed to *United States v. Doyle*, 130 F.3d 523 (2d Cir. 1997), in which the Second Circuit held that an argument similar to Zodhiates's "distorts Rule 405 beyond recognition," because "if specific good deeds could be introduced to disprove knowledge or intention, which are elements of most crimes, the exception of Rule 405(b) would swallow the general rule of 405(a) that proof of specific acts is not allowed." *Id.* at 542. *See also* 1972 Advisory Committee Note to Fed. R. Evid. 405 (hereinafter 1972 ACN) (noting that Rule 405(b) "confines the use of [specific acts] evidence . . . to cases in which character is, in the strict sense, in issue and hence deserving of a searching inquiry"). The Court did hold, however, that Zodhiates "may

. . . seek to offer specific [acts] evidence under the reverse [Rule] 404(b) theory"—that is, Rule 404(b) evidence offered by Zodhiates, rather than the Government. Sept. 21 Tr. 6:16-17 (citing *United States v. Aboumoussallem*, 726 F.2d 906, 912 (2d Cir. 1984)).

Finally, the Court established a procedure for introducing character evidence throughout the trial. The Court noted that it "expect[ed] to rule on [a] witness-by-witness basis whether character testimony is admissible, as well as the form in which testimony may be admitted." *Id.* 6:19-21. "[T]he general rule," the Court stated, would be that Zodhiates "may offer evidence of pertinent character[] traits as permitted under 405(a)." *Id.* 7:3-5. Zodhiates could also "*seek* to introduce character evidence under [a reverse] 404(b) theory." *Id.* 7:6-7 (emphasis added). But if Zodhiates sought to introduce reverse Rule 404(b) evidence, the Court ruled, "he should be prepared to argue why such evidence is admissible under 404(b), even though it would be inadmissible under 405(b)." *Id.* 7:6-9. "In short," the Court observed, it "ha[d] concerns that allowing the defendant to introduce [reverse] 404(b) evidence may circumvent the careful limits . . . Rule 405 place[s] on character evidence." *Id.* 7:10-13. The Court also noted that, no matter the way in which it was introduced, all character evidence would be subject to Rule 403. *Id.* 7:14-16.

At trial, Zodhiates introduced character evidence in the form of reputation and opinion testimony—that is, Rule 405(a) evidence—from a number of witnesses. On occasion, those witnesses also offered specific-acts evidence. For instance, Zodhiates introduced testimony that his company has a goal of donating 50% of its annual net profits to charity. *See* Tr. 651:12-22. Zodhiates also introduced evidence that he and his wife adopted six children from Central America. *See* Tr. 566:4-15; 900:12-16. With

these exceptions, however, and after hearing proffers, the Court excluded the other specific-acts character evidence Zodhiates sought to introduce under a reverse Rule 404(b) theory.

Zodhiates seeks a new trial because the Court excluded much of his proposed reverse Rule 404(b) evidence. This motion is denied for the same two reasons the Court excluded the evidence at trial: Rule 405(b) precludes the evidence and, in any event, the evidence was independently inadmissible under Rule 403.

First, as the Court noted in its September 21 ruling, the Court "has concerns that allowing the defendant to introduce [reverse Rule] 404(b) evidence may circumvent the careful limits . . . Rule 405 place[s] on character evidence." Sept. 21 Tr. 7:10-13. Zodhiates correctly notes that in the context of reverse Rule 404(b) evidence—where the defendant offers evidence of "other act[s]," Fed. R. Evid. 404(b)(1)—"the standard of admissibility . . . need not be as restrictive" as it is when the Government attempts to introduce other acts evidence. *United States v. Aboumoussallem*, 726 F.2d 906, 911 (2d Cir. 1984). But it does not follow that Zodhiates's proposed reverse Rule 404(b) evidence is admissible simply because it was at least marginally relevant to the question of Zodhiates's intent.

To introduce his proposed reverse Rule 404(b) evidence, Zodhiates needed to show not only that the evidence was relevant, but that the *way* in which the evidence "ma[d]e [the] fact [of Zodhiates's intent] more or less probable," Fed. R. Evid. 401(a), was also proper. It is undisputed that Zodhiates sought to have his witnesses testify about past charitable acts that, in Zodhiates's view, illustrate his good character. Thus, the way in which Zodhiates's proposed reverse Rule 404(b) evidence would have made

his intent "more or less probable," Fed. R. Evid. 401(a), is by showing (1) that on prior occasions, he committed specific acts of unconditional charity and generosity; (2) that those specific acts of unconditional charity and generosity demonstrate Zodhiates's character traits for unconditional charity and generosity; and (3) that when he drove Miller and Isabella to Buffalo, Zodhiates was offering unconditional charity and generosity in a manner consistent with his character traits. Stated more simply, Zodhiates's proposed reverse Rule 404(b) evidence sought to use Zodhiates's *character* as the link between his past "other act[s]," Fed. R. Evid. 404(b)(1), and his intent in this case. Thus, before the Court could admit Zodhiates's proposed reverse Rule 404(b) character evidence, the evidence needed to clear the additional hurdle posed by Rule 405(b). *See* 1972 ACN ("[R]ule [405] deals only with allowable methods of proving character, not with the admissibility of character evidence, which is covered in Rule 404.")

Rule 405(b) barred Zodhiates's proposed specific-acts character evidence. Rule 405(b) strictly limits the admission of specific-acts character evidence to "cases in which character is, in the strict sense, in issue and hence deserving of a searching inquiry." *Id.* Likewise, the Second Circuit has been careful to confine specific-acts character evidence to the unlikely case in which character is truly an element of the crime charged. *See United States v. Doyle*, 130 F.3d 523, 542 (2d Cir. 1997). *See also* Mueller & Kirkpatrick, 2 *Federal Evidence* § 4.44 (4th ed. 2013) ("Almost *never* is character an 'element' of a charge or defense in criminal cases—a point that is made graphic by the obscurity of the illustrative example cited by the Advisory Committee.") (emphasis in original). That, as the Court suggested in its September 21 oral ruling, is

17

why the Court largely excluded Zodhiates's proposed reverse Rule 404(b) evidence. Knowledge and intent—the primary issues for which Zodhiates sought to introduce reverse Rule 404(b) evidence—"are elements of most crimes." *Doyle*, 130 F.3d at 542. Thus, if the Court did not treat Zodhiates's proposed reverse Rule 404(b) evidence the same way the evidence would be treated under Rule 405, Rule 405(b) could be circumvented in nearly any case in which the defendant's intent or knowledge was at issue.

This does not mean that a criminal defendant may never introduce reverse Rule 404(b) evidence. A defendant may still introduce other-acts evidence that is relevant to an element of the crime charged (such as intent), provided that the other-acts evidence is not evidence of the defendant's *character*. *See Aboumossallem*, 726 F.2d at 911 (endorsing a reverse Rule 404(b) theory in which the defendant sought to introduce evidence that his codefendants had previously "duped" others into transporting narcotics into the United States to support the defendant's claim that the codefendants had similarly "duped [the defendant] into transporting contraband"). But where a defendant's reverse Rule 404(b) evidence is also character evidence, the Court must treat the reverse Rule 404(b) evidence the same way that it would treat the evidence under Rule 405. In this case, that meant that the evidence was inadmissible, because using specific acts of good character "to prove lack of intent . . . . is not only disfavored, it is not permitted under Rule 405(b)." *United States v. Marrero*, 904 F.2d 251, 259-60 (5th Cir. 1990) (affirming decision to exclude, under Rule 405(b), evidence that the defendant "provided more services to some clients than they were actually billed for and that sometimes she rendered services free of charge," which the defendant sought to

introduce to show that she did not intend to improperly bill a government agency for medical services).   It is for this reason that the Court largely excluded Zodhiates's proposed reverse Rule 404(b) evidence.

The second reason why the Court largely excluded Zodhiates's proposed reverse Rule 404(b) evidence is that, regardless of whether it was admissible under Rule 405, the evidence was still independently inadmissible under Rule 403.   "Of the three methods of proving character provided by [Rule 405], evidence of specific instances of conduct is the most convincing.   At the same time it possesses the greatest capacity to arouse prejudice, to confuse, to surprise, and to consume time."   1972 ACN.   The specific acts of unconditional charity and generosity Zodhiates sought to introduce were, in addition to testimony from Zodhiates's many other character witnesses, unnecessarily cumulative, particularly when compared to the evidence's limited probative value.

More fundamentally, though, Zodhiates's proposed specific-acts evidence risked "'suggest[ing] decision [to the jury] on an improper . . . emotional'" basis.   *Old Chief v. United States*, 519 U.S. 172, 180 (1997) (quoting Advisory Committee Note to Rule 403).   Testimony about Zodhiates's many specific acts of charity would have shown Zodhiates to be a charitable and generous man.   But the connection between those acts and the issue of Zodhiates's intent in this case was, at best, non-intuitive.   If introduced, this testimony therefore carried an unnecessarily high risk of distracting the jury from the issues the jury was charged with deciding.   In other words, the evidence presented too much risk that the jury would make a decision based not on whether the evidence showed that Zodhiates intended to obstruct Jenkins's parental rights, but based instead on whether Zodhiates is a generous man who deserved to be convicted.

Zodhiates's motion for a new trial based on the Court's exclusion of character evidence is therefore denied.

### 3. Jury instructions regarding intent and knowledge

Zodhiates's next argument for a new trial concerns the Court's jury instructions "relating to intent and knowledge." Zodhiates Br. at 10. Zodhiates makes two related arguments why the Court's instructions were, in his view, incorrect or incomplete.

### i. Zodhiates's request for an instruction regarding the state of Isabella's "habitual residence"

Zodhiates's primary argument is that the Second Circuit defines "parental rights" under the IPKCA "by reference to the law of the specific state within the United States in which the child was habitually resident immediately before the challenged conduct." Zodhiates Br. at 11 (citing *United States v. Amer*, 110 F.3d 873, 878 (2d Cir. 1997)). The Government does not appear to dispute Zodhiates's claim that Virginia was Isabella's state of "habitual residence" before she was removed from the United States. *See id.* at 12 (Zodhiates' Br.); Docket No. 131 (Gov't Br.) at 11. Thus, Zodhiates argues, at the time Isabella was kidnapped, "it would have been legally impossible for anyone to obstruct the parental rights of Janet Jenkins under [the IPKCA] because the parental rights of Janet Jenkins would have been defined by the law of Virginia," which, at the time, made "same-sex marriages entered into outside of Virginia . . . 'void in all respects . . .,'" and which provided that out-of-state same-sex marriages "could not be used to establish familial or stepparent rights." Docket No. 127 at 12 (quoting *Damon v.*

*York*, 54 Va. App. 544, 554 (Va. Ct. App. Aug. 11, 2009)) (some quotation marks omitted).[8]

As is relevant here, the IPKCA defines the term "parental rights" as "the right to physical custody of the child . . . whether arising by operation of law, court order, or legally binding agreement of the parties."   18 U.S.C. § 1204(b)(2)(B).   However, in *United States v. Amer*, 110 F.3d 873 (2d Cir. 1997)—one of the few Second Circuit cases to have interpreted the IPKCA—the Second Circuit suggested that the IPKCA's definition of "parental rights" is narrower than the statute's language states.   In *Amer*, the defendant was a citizen of both Egypt and the United States.   He and his wife had three children; two were born in the United States, and the third moved to the United States from Egypt at a young age.   *Id.* at 876.   All three children lived in New York City for most of their lives.   *Id.*   After the defendant's marriage began to deteriorate, however, he fled the United States with his children and brought them to Egypt.   *Id.*   The defendant was eventually convicted of violating the IPKCA.   On appeal, he argued, among other things, that the term "lawful exercise of parental rights" in the IPKCA is unconstitutionally vague because the IPKCA "does not provide any guidance as to whether parental rights are to be defined by state law, federal law, Egyptian law, customary international law, or positive law promulgated by the United Nations."   *Id.* at 878 (quotation marks omitted).

---

[8]   The Government argues that Zodhiates "forfeited his right to seek this jury instruction" by not "maintaining prior to trial that parental rights were defined by Virginia law."   Gov't Br. at 8.   Zodhiates first requested this instruction on the afternoon of September 28, after the charge conference and after the parties finished their summations, but before the Court charged the jury on September 29. On the morning of September 29, the Government responded to Zodhiates's requested charge by arguing, in part, that Zodhiates had waited too long to propose the charge.   The Court, however, exercised its discretion to consider Zodhiates's argument.   The Court likewise exercises its discretion to consider this argument in Zodhiates's Rule 33 motion.   Finally, the Court notes that Zodhiates raised the same argument in his objections to Magistrate Judge McCarthy's Report and Recommendation.   *See* Docket No. 70 at 22.

The Second Circuit held that the term "parental rights" in the IPKCA is not unconstitutionally vague "because Congress made clear in the legislative history of the Act that 'parental rights are to be determined by reference to State law, in accordance with the Hague Convention." *Id.* at 878 (quoting H.R. Rep. No. 103-390 at 4 (1993)) (ellipsis and some quotation marks omitted).  Specifically, the Second Circuit noted, "Article 3 of the Hague Convention provides that parental rights are to be defined by 'the law of the State in which the child was *habitually resident* immediately before the removal or retention.'" *Id.* (quoting Art. 3(a), Hague Convention on the Civil Aspects of Int'l Child Abduction, *opened for signature* Oct. 25, 1980, 19 I.L.M. 1501, T.I.A.S. No. 11670 (1980) (entered into force for the United States, July 1, 1988)) (emphasis added). Applied to the facts of *Amer*, the Second Circuit observed that, "[a]lthough the concept of the state of 'habitual residence' might be unclear at the margins, there is no doubt that, in [*Amer*], New York is that place.  At the time of their abduction, [the defendant's first child] had resided in New York for eight years, and [his two other children] had lived in New York since their birth.  Moreover, there is no confusion under New York law that [the defendant's wife], as the biological mother, enjoys the right to physical custody of her children unless and until this right is terminated by law." *Id.  Amer* therefore makes clear that "parental rights" under the IPKCA are determined by reference to state law. *See also United States v. Fazal-Ur-Raheman-Fazal*, 355 F.3d 40, 45 (1st Cir. 2004) (noting that the "IKPCA looks to state *family* law for purposes of defining 'parental rights'") (emphasis in original).

But it does not follow, as Zodhiates argues, that the state of a child's habitual residence is *always* the state whose law defines "parental rights."  The IPKCA first

defines the term "parental rights" to include rights that "aris[e] by operation of law."  18 U.S.C. § 1204(b)(2)(B).  That definition captures a situation, such as the one in *Amer*, in which the *only* possible source of parental rights is the law of the state in which a child lived before his or her removal.  In other words, where a custody dispute has not been resolved by court order or by settlement, the law of the state of the child's habitual residence provides a default source of parental rights governing liability under the IPKCA.  But the IPKCA's definition of "parental rights" also includes sources of law that can supplant the default custody arrangement provided by state family law.  Specifically, the IPKCA defines "parental rights" to include rights that arise by "court order" or by "legally binding agreement of the parties."  18 U.S.C. § 1204(b)(2)(B).

In each of the cases on which Zodhiates relies, there was no way to define "parental rights" *other* than by looking to the operation of state law—in other words, there was neither a "court order" nor a "legally binding agreement of the parties."  *Id.* *See Amer*, 110 F.3d at 876 (noting that the defendant and his wife "did not . . . divorce or become legally separated" and that "[n]o formal custody arrangement was made"); *Fazal-Ur-Raheman-Fazal*, 355 F.3d at 43 (noting that, at the time the defendant kidnapped his children, "there existed no court order or other agreement between them affecting custody of the children"); *United States v. Homaune*, 898 F. Supp. 2d 153, 157 (D.D.C. 2012) (noting that, at the time the defendant kidnapped his child, he and his separated wife "never made formal legal arrangements to settle custody").  Thus, in each of those cases, it made sense to look to the law of the state of the child's habitual residence to determine what "parental rights" were at issue because there was simply nowhere else to look.  Here, by contrast, at the time of Isabella's removal, parental

rights were governed by "court order."   18 U.S.C. § 1204(b)(2)(B).   As a result, *Amer*'s language concerning the state of a child's "habitual residence" is irrelevant in this case.

It also does not matter that Vermont and Virginia laws governing same-sex marriage and same-sex parenting were, as Zodhiates argues, "in sharp conflict" at the time Isabella was removed from the United States.   Zodhiates Br. at 24.   However Virginia courts treated out-of-state same-sex marriages at the time of Isabella's removal, what matters for purposes of this case is that, by 2006, the Virginia Court of Appeals concluded that Virginia courts should "extend full faith and credit to the custody and visitation orders of the Vermont court."   *Miller-Jenkins v. Miller-Jenkins*, 637 S.E.2d 330, 337 (Va. Ct. App. 2006).   And by the time Isabella was removed from the United States, the Vermont court that had jurisdiction over Isabella's custody dispute had ordered that Jenkins would have the right to visit Isabella.   Zodhiates's argument based on the state of Isabella's habitual residence is therefore without merit.

### ii.   Zodhiates's request for a curative instruction following the AUSA's rebuttal summation

In addition to his "habitual residence" argument, Zodhiates makes a related claim that the Assistant United States Attorney (AUSA) incorrectly stated in his rebuttal summation that "[i]t doesn't matter what [Zodhiates] understands about Virginia litigation."[9]   Tr. 1097:23-34.   In response to this statement, Zodhiates requested that the

---

[9]   In context, the AUSA's statement was as follows:

> Second, I'd ask you whether [defense counsel] was fair to me in quoting what I said to you about the government's case.   [Defense counsel] said that I said that we had to prove that the defendant understood the Virginia litigation.   I thought I said the exact opposite.   I said, I thought, that all I have to prove is that the defendant knew what the parental rights were in Vermont and that he acted and agreed with Lisa to help her obstruct those rights.   I thought I said it to you on multiple occasions.   It doesn't matter what he understands about Virginia litigation.   That's what I thought I said.

Court instruct the jury, in relevant part, that, "[i]n its summation, the Government suggested that Virginia law is irrelevant to this case.  That is incorrect."  Docket No. 122 at 2.  The Court declined to give the proposed instruction, noting that the instruction it intended to give did not "preclude[] the jury from considering both the Virginia and the Vermont litigation when it decides whether the defendant knew about and intended to obstruct Vermont rights."  Tr. 1125:8-11.  The Court also observed that, in its view, "expressly instructing the jury that it may consider . . . Virginia litigation when deciding whether the defendant intended to obstruct Vermont rights runs the risk of unnecessarily confusing the jury as to what parental rights exactly are at issue in the indictment."  Tr. 1125:17-21.

To obtain a new trial based on a prosecutor's purportedly improper statement made in summation, a "defendant[] bear[s] the 'heavy burden' of demonstrating that the alleged misconduct is 'so severe and significant as to result in the denial of [the defendant's] right to a fair trial.'"  *United States v. Abdallah*, 840 F. Supp. 2d 584, 623 (E.D.N.Y. 2012) (quoting *United States v. Locascio*, 6 F.3d 924, 945 (2d Cir. 1993)).  Thus, "[a] court 'will not lightly overturn a conviction solely on the basis of a prosecutor's misstatement in summation.'"  *Id.* (quoting *United States v. Nersesian*, 824 F.2d 1294, 1327 (2d Cir. 1987)) (some quotation marks omitted).  Before deciding whether Zodhiates was prejudiced by a statement in the AUSA's rebuttal summation, however, the Court must first decide whether any part of the rebuttal was, in fact, improper.  In making this determination, the Court is mindful that "[t]he law has long recognized that summations—and particularly rebuttal summations—are not 'detached expositions,' with every word 'carefully constructed before the event.'"  *United States v. Farhane*, 634

Tr. 1097:14-24.

F.3d 127, 167 (2d Cir. 2011) (quoting, in turn, *United States v. Wexler*, 79 F.2d 526, 530 (2d Cir. 1935) and *Donnelly v. DeChristoforo*, 416 U.S. 637, 646-47 (1974) (ellipses and brackets omitted)). It is "[p]recisely because such arguments frequently require 'improvisation'" that "courts will 'not lightly infer' that every remark is intended to carry 'its most dangerous meaning.'" *Id.* (quoting *Donnelly*, 416 U.S. at 647).

The AUSA's comment that the Virginia litigation "doesn't matter" was not improper. Viewed in context, the AUSA's statement about the Virginia litigation was a response to an argument made in defense counsel's summation. Specifically, during his summation, defense counsel argued as follows:

> Why do I make a point of that [i.e., the complexity of the custody litigation]? I make a point of that for one very simple reason, because you all have to put yourself in the head of Philip Zodhiates and decide what he intended. Did he understand what the parental rights were in September of 2009 or is there some doubt about that? There were many complexities.
>
> Looking at the evidence of this case—and I'll make one point about this— [the AUSA]—and I don't know whether it was intentional or whether it was a slip—at 11:37 a.m. this morning he said to you, in his closing remarks, the government must prove Philip Zodhiates understood the rights and understood the Vermont litigation and the Virginia litigation. I agree with him. That is exactly what the government must prove.

Tr. 1079:12-25. The AUSA's comment in rebuttal appeared to be a direct response to defense counsel's argument. Indeed, the AUSA prefaced his comment by asking the jury "whether [defense counsel] was fair to me in quoting what I said to you about the government's case. [Defense counsel] said that I said that we had to prove that the defendant understood the Virginia litigation. I thought I said the exact opposite." Tr. 1097:14-18. Based on that preface, the AUSA's comment appears to have been

26

intended to remind the jury of the Government's interpretation of the evidence: that when deciding whether the Government proved Zodhiates's intent, the jury should focus only on what Zodhiates knew about the Vermont litigation, because it was Vermont law—not Virginia law—that defined Jenkins's parental rights.   In other words, put in context, the AUSA's comment simply told the jury that, in the Government's view, Zodhiates's interpretation of the evidence was wrong—not that Zodhiates's understanding of the Virginia litigation was legally irrelevant.[10]

This was not improper.   A prosecutor is permitted to respond to defense arguments in his or her rebuttal.   *See United States v. Marrale*, 695 F.2d 658, 667 (2d Cir. 1982) (noting that "a prosecutor is ordinarily entitled to respond to the evidence, issues, and hypotheses propounded by the defense").   And as part of that response, a prosecutor is permitted to argue that the defendant's arguments are, in the prosecutor's view, wrong or irrelevant.   *See United States v. Williams*, 690 F.3d 70, 75 (2d Cir. 2012) ("Just as we see nothing inherently wrong with characterizing a defense tactic as desperate, we do not think it improper or excessive, without more, for a prosecutor to criticize defense arguments as merely being attempts to 'grasp at straws' or 'focus on distractions.'") (citation and some quotation marks omitted).   The AUSA's comment was, therefore, well within bounds, and a curative instruction was not required.

---

[10]   Even if the jury understood the AUSA's comment to mean that Zodhiates's understanding of the Virginia litigation was legally irrelevant, the Court instructed the jury that it must determine "what the defendant knew or intended with regard to" Jenkins' parental rights under Vermont law.  Tr. 1159:13-15. As the Court observed before it instructed the jury, the Court's charge "mention[ed] neither Virginia litigation nor the Vermont litigation," and "nothing in the Court's . . . instructions suggest[s] that the jury may not properly consider evidence from both Vermont and Virginia."  Tr. 1125:11-16.  To the extent the AUSA's statement appears inconsistent with the Court's charge, it is, of course, the Court's charge that controls the jury's deliberations.   *See* Tr. 1130:8-10 (Court's instruction to jury that, "[i]f a lawyer has stated a legal principle different from any that I state to you in my instructions, it is my instructions that you must follow").   "[J]uries are presumed to follow their instructions," *Richardson v. Marsh*, 481 U.S. 200, 211 (1987), and the Court has no reason to suspect that the jury did not do so in this case.

27

Zodhiates's motion for a new trial based on the Court's decision to not give a curative instruction is therefore denied.

### 4. Questions asked, and interjections made, by the Court

Zodhiates's final argument for a new trial concerns questions the Court asked a Government witness at the conclusion of his testimony, as well as two interjections the Court made during defense counsel's summation.  The Court addresses each argument in turn.

### i.  The Court's questioning of Ervin Horst

At trial, the Government introduced the testimony of Ervin Horst, a Mennonite pastor who lives in Ontario.  Mr. Horst testified that at Kenneth Miller's request, he picked up Lisa Miller and Isabella from Niagara Falls, Ontario and drove them to the Toronto airport.  Mr. Horst also testified that Kenneth Miller had first asked him to cross the U.S.-Canadian border to retrieve Lisa Miller and Isabella from Buffalo.  But, Mr. Horst testified, after reflecting on Kenneth Miller's request, he declined to do so, because "picking someone up and taking them to another country caused me concern." Tr. 148:11-12.  After the AUSA asked Mr. Horst why "it cause[ed] [him] concern," Mr. Horst responded: "Well, to pick someone up in Ontario and take them to another point in Ontario seemed very easy but, you know."  Tr. 148:13-16.  Mr. Horst then told the jury that after thinking about Kenneth Miller's request and discussing it with Mr. Horst's wife, he told Kenneth Miller that "we would not be able to come to Buffalo like he requested." Tr. 149:15-16.  Mr. Horst testified that he ultimately agreed to pick Lisa Miller and Isabella up from a motel in Niagara Falls, Ontario.  Mr. Horst then described in detail how he met Miller and Isabella in Niagara Falls and drove them to Toronto early the

next morning.  Defense counsel then cross-examined Mr. Horst.  After re-direct and re-cross, the Court asked the following questions:

> The Court: Why didn't you go and—why didn't you pick them up in the United States?
>
> Mr. Horst: Crossing an international border to pick someone up, to me, was different than picking someone up in one place in Ontario and transporting them to another.
>
> The Court: Well, how so?
>
> Mr. Horst: It didn't feel good to me to pick someone up in the United States and to take them to Ontario
>
> The Court: All right.  Let me ask then: Why didn't it feel good?  What did you feel like, there was something wrong?
>
> Mr. Horst: It felt like there might be.  There was a better chance of getting repercussions about the matter in the future.
>
> The Court: All right.  Thank you, sir.
>
> [AUSA]: Thank you, Your Honor.

Tr. 179:10-25.  Neither the Court nor the parties asked any additional questions of Mr. Horst.

Zodhiates argues that he should receive a new trial because of the questions the Court asked Mr. Horst.  Specifically, Zodhiates notes that, during cross examination, defense counsel "asked a series of questions of Mr. Horst that emphasized the similarity of Mr. Horst's transporting of Lisa Miller from one point to another within a single country with the travel evidence the government introduced regarding Mr. Zodhiates." Zodhiates Br. at 15.  Defense counsel then "asked a series of questions of Mr. Horst designed to elicit his understanding of whether he had done anything wrong." *Id.*  Mr.

Horst testified that he did not believe he did anything illegal by driving Miller and Isabella from Niagara Falls, Ontario to Toronto.  Zodhiates argues that the Court's questions of Mr. Horst had the "effect of . . . transform[ing] the helpful concession defense counsel had elicited—that Mr. Horst, who took actions similar to the overt acts alleged by the prosecution, did not believe he did anything wrong—into a harmful suggestion that Mr. Horst in fact believed crossing the border could have been unlawful."  *Id.*  Zodhiates therefore seeks a new trial based on the Court's questions because, he argues, the Court's questions "could have been interpreted by the jury 'almost as a redirect' of a government witness indicating that the Court did not believe the defendant's intent theory."  *Id.* at 15-16 (quoting *United States v. Filani*, 74 F.3d 378, 386 (2d Cir. 1996)).

"[T]he trial court may actively participate and give its own impressions of the evidence or question witnesses, as an aid to the jury, so long as it does not step across the line and become an advocate for one side."  *United States v. Filani*, 74 F.3d 378, 385 (2d Cir. 1996).  A court may, then, ask a witness clarifying questions that help the jury understand the witness's answer to a question.  When a trial court asks questions of a witness, "the overriding consideration is whether the judge saw to it that the jury had all the admissible evidence and knew it was free to find the facts as it thought the evidence showed them to be."  *Id.* at 386.

The Court's brief questioning of Mr. Horst clarified Mr. Horst's nonresponsive answer to a question asked during his direct examination.  During the Government's direct examination of Mr. Horst, Mr. Horst testified that "the idea of crossing an international border and picking someone up and taking them to another country caused me concern."  Tr. 148:10-12.  The AUSA then asked Mr. Horst "[w]hy . . .it cause[d]

[him] concern?"  Mr. Horst responded: "Well, to pick someone up in Ontario and take them to another point in Ontario seemed very easy but, you know."  Tr. 148:14-15.

The Court's questioning of Mr. Horst clarified the answer that Mr. Horst gave (or, rather, did not give) to the AUSA's question, "Why did it cause you concern?"  Mr. Horst's answer to that question was, quite plainly, nonresponsive.  The Court's questions of Mr. Horst were therefore an exercise of the Court's "active responsibility to insure that issues are clearly presented to the jury" by "clarifying ambiguities" in Mr. Horst's answer to a question, rather than letting Mr. Horst's non-answer—"but, you know"—linger in the jury's mind and, possibly, trigger speculation.  *United States v. Pisani*, 773 F.2d 397, 403 (2d Cir. 1985).  *See also United States v. Lasher*, 661 F. App'x 25, 27-28 (2d Cir. 2016) (finding no issue with district court's "few and inoffensive" comments during defendant's testimony, where "trial judge admonished [defendant] on a few occasions when [defendant] was unresponsive or evasive in her answers").  In other words, the Court "acted within its discretion in posing clarifying questions to aid the jury's understanding."  *United States v. Daniel*, 570 F. App'x 14, 16 (2d Cir. 2014).  "Such conduct did not manifest improper bias."  *Id.*

### ii.    The Court's interjections during defense counsel's summation

Finally, Zodhiates seeks a new trial based on two interjections the Court made during defense counsel's summation.  First, early in defense counsel's summation, the Court interjected to correct defense counsel's characterization of the reasonable doubt standard after defense counsel introduced a slide showing the scales of justice:

> Defense counsel: So, you're going to weigh this evidence.  And in some cases, you have these scales.  There is no evidence of guilt.  In some cases, there is evidence of guilt.  In some cases, the burden is to prove a

31

civil case, for example by a preponderance of the evidence.  So, you have the scales and if one side makes weight, then that is sufficient to carry the burden.  Some cases, you may be familiar with this, require clear and convincing evidence; fraud cases, other kinds of cases.  So that's even more weight.

But still it's not beyond a reasonable doubt.  The very heaviest burden that we have in our system is beyond a reasonable doubt.  And I'm going to show you, as we go through the evidence, that there is a tremendous amount of doubt in this case.

The Court: Not doubt.

Tr. 1073:8-22.  Defense counsel then began discussing the charges and the evidence.

Later in defense counsel's summation, the Court again interjected to address the reasonable doubt standard.  Specifically, in his summation defense counsel observed that, despite the number of Government agencies involved in this case, the Government had not introduced testimony from an immigration official.  The following exchange then occurred:

Defense counsel:  You did not hear that and you won't hear that.  That's a doubt as well, especially as it goes to this question of retain.

Now, let me talk to you a little bit more specifically about reasonable doubt.

The Court: You have used that term many, many times.  I'll explain to the jury what reasonable doubt is.

Defense counsel: Yes, yes.  Of course.

The Court: You have gone over this over and over and you're repeating yourself over and over again.

Defense counsel: Absolutely, Your Honor.

The Court: All right.  So, go on to something about the evidence and what the government failed to prove.

Defense counsel: I will do that, Your Honor.  And I don't mean to suggest, of course, that it's my function to instruct you as to what the law is.  That is not my function.  It's the Judge's function.  I'm sure that you will hear about it, but I am going to tell you about the evidence.

Tr. 1088:4-21.  Defense counsel then discussed the evidence.

The Court's interjections during defense counsel's summation were a response to what the Court believed were suggestions that the reasonable doubt standard is something different than what it is.  On several occasions during summation, defense counsel suggested that the jury should vote to acquit if it found "doubt" or "reasonable doubt" on any one of several disputed *facts*.[11]  Of course, the reasonable doubt standard is different: "It is settled that the Government's burden of proof beyond a reasonable doubt applies to each *element* of each offense charged."  *United States v. Viafara-Rodriguez*, 729 F.2d 912, 913 (2d Cir. 1984) (emphasis added) (collecting cases).  And "[i]t is also true that the burden does not operate upon each of the many

---

[11]  *See* Tr. 1083:5-11 ("So, who is Philip Zodhiates, on the other hand?  And this is a very interesting contrast.  And I'm going to raise a couple of other doubts for you, as I say this.  Without any contradiction, none, as I said to you in my opening statement, Mr. Zodhiates is a very special kind of person.  He is exceedingly generous, without condition [the AUSA] said, whatever that means."); *id.* 1086:2-7 ("And that in the taxi cab—I don't think there is even evidence that [Lisa Miller and Isabella] were wearing [Mennonite clothing] in the taxi cab, but in any event, there's certainly no evidence that Philip Zodhiates gave them or saw them.  So, we'll just call that reasonable doubt number 1, but I'm going to come back to that in a minute."); *id.* 1090:19-23 ("Philip Zodhiates didn't deliver—didn't sign a check, didn't give the check to Andrew Yoder, didn't travel with the check to Nicaragua.  There's no evidence of that money even getting to Lisa Miller.  So, there's another basis for reasonable doubt."); *id.* 1091:5-8 ("Many of the government witnesses . . . never even heard of Philip Zodhiates . . . .  That's another reasonable doubt."); *id.* 1095:16-21 ("I just would like you to firmly keep in mind that it's necessary to consider all of the evidence, don't pick and choose.  If you have a reasonable doubt, any one of the 18 or so that I have pointed out to you that causes you to hesitate, as you would something in your own life, then you can't find him guilty."); *id.* 1096:2-6 ("And if you have doubts, if you have reasonable doubts, then your obligation, your oath requires you to acquit.  And I think I've given you plenty of doubts on which to seize and to think about and to base a verdict of not guilty.")

subsidiary facts on which the prosecution may collectively rely to persuade the jury that a particular element has been established beyond a reasonable doubt." *Id.*

The Court's interjections during defense counsel's summation were intended to correct what the Court believed were suggestions that the Government fails to meet its burden if the jury finds "doubt" on any one (or several) of the individual facts the Government uses to support its case. A district court has "broad discretion" in controlling summation, *Herring v. New York*, 422 U.S. 853, 862 (1975), and, among its duties in presiding over the parties' summations, a district court "has a duty to control final argument and to prevent any improper arguments." *United States v. Spillone*, 879 F.2d 514, 518 (9th Cir. 1989). *See also United States v. Young*, 470 U.S. 1, 13 (1985) (suggesting that the proper course when defense counsel makes improper argument is to "interrupt the argument and admonish him"). The Court is prohibited from instructing the jury that "'separate bits of evidence' need not be proved beyond a reasonable doubt." *United States v. Gatzonis*, 805 F.2d 72, 74 (2d Cir. 1986) ("We write now to make completely clear that district judges should not charge that 'separate bits of evidence' need not be proved beyond a reasonable doubt.") Thus, the Court was severely limited in its ability to use its jury instructions to remind the jury of the correct reasonable doubt standard. In this situation, it was appropriate for the Court to briefly interrupt defense counsel's summation by asking counsel to discuss the evidence, rather than the law. *See also* Tr. 1037:24 - 1038:2 (Court's reminder to attorneys before summation that, "[m]y thing is you can argue evidence or any reasonable inferences. Keep it at those. Keep those two points in mind. And careful when you start getting into explaining the law").

Zodhiates's motion for a new trial based on the Court's questions and interjections is therefore denied.

## CONCLUSION

For the reasons stated above, the Court denies Zodhiates's renewed Rule 29 motion for a judgment of acquittal as well as his Rule 33 motion for a new trial.

**SO ORDERED.**


Dated: February 14, 2017                    ___*s/Richard J. Arcara*___
      Buffalo, New York                    HONORABLE RICHARD J. ARCARA
                                        UNITED STATES DISTRICT JUDGE