UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA

v.

PHILIP ZODHIATES, et al.,
Defendants.

Docket No. 1:14-cr-175-RJA-JJM

---

## DEFENDANT'S MOTION TO STAY SENTENCE PENDING APPEAL

Defendant, Philip Zodhiates, by and through his counsel, hereby moves this Court pursuant to 18 U.S.C. § 3143(b) for an order staying any term of imprisonment he may receive because (a) there is clear and convincing evidence that he will not flee or pose a danger to any another person of the community if released; and (b) his appeal raises a substantial question of law that is likely to result in a reversal, or order for a new trial, because: (1) the jury was incorrectly instructed, (2) location information obtained without a warrant was improperly admitted, (3) character evidence was improperly excluded, and (4) interjections by the Court were improper.

gravel &
shea   ATTORNEYS AT LAW
A PROFESSIONAL CORPORATION
76 St. Paul Street
P.O. Box 369
Burlington, Vermont 05402-0369

<u>Memorandum</u>

I.    MR. ZODHIATES WILL NOT FLEE AND POSES NO DANGER TO THE COMMUNITY IF RELEASED PENDING APPEAL.

Mr. Zodhiates was released on conditions before and after trial because this Court found that he did not pose a risk of flight or a danger to the community. While released under several conditions, Mr. Zodhiates fully complied with all of them and this Court's orders. He has appeared whenever and wherever he was asked, including federal courts in Charlottesville, Virginia and Buffalo. He has not committed any crimes nor engaged in any behavior that would be of concern.

Mr. Zodhiates' behavior since he was indicted provides clear and convincing proof that if this Court stays any sentence of imprisonment while his appeal is pending, he poses neither a risk of flight nor a danger to any person or the community.

II.    MR. ZODHIATES' APPEAL WILL RAISE A SUBSTANTIAL ISSUE OF LAW THAT WILL LIKELY RESULT IN THE CONVICTION BEING SET ASIDE.

    A.    <u>The Jury Instructions on Intent Are in Substantial Tension with Binding Second Circuit Precedent.</u>

As the Court observed in its recent ruling denying Mr. Zodhiates's posttrial motions "The central dispute at trial was whether the Government proved Zodhiates's intent beyond a reasonable doubt." Doc. No. 164 at 3. The Court also observed that many of the e-mails introduced by Mr. Zodhiates at trial "were, from a layman's perspective, possibly equivocal or ambiguous on the question whether Jenkins had any valid parental rights." *Id.* at 6. For example, Defendants Exhibit 41, an e-mail distributed by Liberty Counsel states, among other things, "Virginia's state law and Constitution expressly ban enforcement of any right or order arising

gravel &
shea   ATTORNEYS AT LAW
A PROFESSIONAL CORPORATION
76 St. Paul Street
P.O. Box 369
Burlington, Vermont 05402-0369

- 2 -

from same-sex marriage, civil unions, or domestic partnerships" and that "Virginia law declares to be void in all respects" the civil union based order Janet Jenkins sought to enforce.

Parental rights for purposes of 18 U.S.C. § 1204 are defined by the law of the state within the United States in which the child was habitually resident immediately before the removal or retention. *See United States v. Amer*, 110 F.3d 873, 878 (2d Cir. 1997). Accordingly, it was the position of Mr. Zodhiates throughout this case that to prove intent to obstruct parental rights, the prosecution was required to prove that Mr. Zodhiates knew that Ms. Jenkins had parental rights as a matter of Virginia law and that he intended to obstruct those rights.

Although the prosecution has never disputed that Isabella's state of habitual residence was Virginia, the Court declined to instruct the jury that the government was required to prove that Mr. Zodhiates knew Janet Jenkins had parental rights as a matter of Virginia law and intended to obstruct those rights. The instruction rejected by the Court was particularly important given that the government forcefully argued in closing to the jury:

> The defense has focused much on the Virginia litigation between Lisa and Janet. The fact of that litigation doesn't provide a defense to Philip Zodhiates for at least three reasons. First, his Honor, I think, will instruct you that the law that governs parental rights in this case is Vermont law. **The Virginia litigation, Lisa Miller's attempt to frustrate Vermont law in Virginia, had nothing to do with the force of Vermont law.**
>
> The government has a burden of proving that the defendant knew about Janet's parental rights under Vermont law and that he wanted to help Lisa in her effort to frustrate those rights. **And since the Virginia courts couldn't alter Vermont law, this litigation should have no bearing on the intent issues.**
>
> The government doesn't have the burden of proving that Philip Zodhiates understood the Virginia litigation, just that the defendant understood that Janet had parental rights under Vermont law and that he supported Lisa's goal to frustrate those rights. **Don't be distracted from the real issues.**

Tr. at 1054 – 1055 (emphasis added).

gravel & shea ATTORNEYS AT LAW
A PROFESSIONAL CORPORATION
76 St. Paul Street
P.O. Box 369
Burlington, Vermont 05402-0369

- 3 -

Mr. Zodhiates respectfully submits that the Court's instructions were contrary to binding Second Circuit precedent set forth in *United States v. Amer*, 110 F.3d 873, 878 (2d Cir. 1997). *Amer* rejected a challenge that the term "parental rights" was unconstitutionally vague by holding that "Congress made clear" what law defines parental rights, with the answer being "the law of the State in which the child was habitually resident immediately before the removal or retention." *Id.* at 870 (quotations omitted). Because *Amer* held that parental rights are defined by the law of the state of habitual residence of the child immediately before the challenged removal, the Court was obligated to apply the Second Circuit's interpretation of 18 U.S.C. § 1204. To the best of Mr. Zodhiates's knowledge, prior to the Court's decision and order denying the posttrial motions filed by Mr. Zodhiates, "every court that has opined on the issue" has concluded that parental rights are defined by the law of the state of habitual residence of the child immediately before the challenged actions. *Compare United States v. Homaune*, 898 F. Supp. 2d 153, 160-161 (D.D.C. 2012) *with* Doc. No. 164.

The combined effect of the government's statement that it "doesn't have the burden of proving that Philip Zodhiates understood the Virginia litigation" and the Court's instructions was to effectively take from the jury the core question of intent – whether Mr. Zodhiates knew Janet Jenkins had parental rights as a matter of Virginia law and intended to obstruct them. Because the Court instructed the jury in a manner inconsistent with *Amer* on an issue that was central to the case, Mr. Zodhiates's appeal raises a substantial question of law that is likely to result in reversal or an order for a new trial.

    B.    <u>The Second Circuit Has Not Decided the Constitutionality of Obtaining Location Information – As the Government Did in This Case – Without a Warrant.</u>

In *United States v. Jones*, five justices agreed that when the Government engages in prolonged location tracking, it conducts a search under the Fourth Amendment. 132 S. Ct. 945,



gravel & shea ATTORNEYS AT LAW
A PROFESSIONAL CORPORATION
76 St. Paul Street
P.O. Box 369
Burlington, Vermont 05402-0369

- 4 -

955 (2012) (Sotomayor, J concurring); *id.* at 960, 964 (Alito, Ginsburg, Breyer, Kagan, Js concurring). Here, the Government sought location information for Mr. Zodhiates over a 28 month period by grand jury subpoena and introduced some of that information at trial. The Second Circuit recently declined to resolve the "important and complex Fourth Amendment question" raised by Mr. Zodhiates's pretrial motion to suppress, leaving it an open question in this Circuit. Mr. Zodhiates respectfully submits that whether the Government violated the Fourth Amendment by seeking 28 months of location data by grand jury subpoena is a substantial question of law that is likely to result in reversal or an order for a new trial.

C. Additional Character Evidence Offered by Mr. Zodhiates Was Admissible.

Another substantial aspect of the intent proof at trial was the contrast between the theory of the government that Mr. Zodhiates acted out of "religious intolerance of same-sex marriages" and evidence Mr. Zodhiates sought to offer of specific acts of unconditional generosity. "[T]he drafters contemplated that Rule 404(b) would be construed as a rule of 'inclusion' rather than 'exclusion.'" *Ansell v. Green Acres Contr. Co.*, 347 F.3d 515, 526 (3d Cir. 2003) (quoting *United States v. Scarfo*, 850 F.2d 1015, 1019 (3d Cir. 1988)). As the Court noted in its ruling denying Mr. Zodhiates's post-trial motions, the Second Circuit has stated that "the standard of admissibility when a criminal defendant offers similar acts evidence as a shield" under 404(b) "need not be as restrictive as when a prosecutor uses such evidence as a sword." *United States v. Aboumoussallem*, 726 F.2d 906, 911 (2d Cir. 1984).

Here, the Court consistently treated Rule 404(b) as a rule of exclusion, excluding important evidence that went to the critical question of intent and specifically to rebut the suggestion that Mr. Zodhiates was motivated to act by religious intolerance by demonstrating that he helps others unconditionally—even those whose religious beliefs or sexual orientation differ from his—without even considering their lifestyle or beliefs. The exclusion of this

gravel &
shea | ATTORNEYS AT LAW

A PROFESSIONAL CORPORATION
76 St. Paul Street
P.O. Box 369
Burlington, Vermont 05402-0369

- 5 -

evidence was problematic because it hamstrung the ability of the defense to establish Mr. Zodhiates's actual intent and because it allowed the Prosecution to suggest that character witnesses called by Mr. Zodhiates were merely friends trying to help Mr. Zodhiates, not witnesses whose testimony had a powerful and credible foundation in fact.

The evidence excluded went to the issue of intent, which the Court's recent post–trial ruling identifies as the central issue at the trial of this case. Mr. Zodhiates respectfully submits that whether this evidence should have been admitted is a substantial question of law likely to lead to an order for a new trial.

D. Interjections During the Trial.

While it is well-established that Courts may ask clarifying questions of witnesses, the Second Circuit has previously found error requiring a new trial where a Court followed a cross examination in which defense counsel obtained a helpful concession from a government witness "with a series of follow-up questions that entirely demolished the helpful concession." *United States v. Filiani*, 74 F.3d 378, 382 (2d Cir. 1996). Similarly, the Second Circuit has found problematic a series of questions following cross examination of a defendant that further challenged the credibility of the witness. *See United States v. Victoria*, 837 F.2d 50, 55 (2d Cir. 1988).

Here, on page 148 of the testimony of prosecution witness Ervin Horst, Mr. Horst stated that he paused to think whether to pick Lisa Miller up in Buffalo for two reasons: "Well, the first thing was, it was something totally new. The second point was that the idea of crossing an international border and picking someone up and taking them to another country caused me concern." Tr. at 148:9 – 12. The prosecution asked a single follow-up question "Why did it cause you concern?" to which Mr. Horst responded "Well, to pick someone up in Ontario and take them to another point in Ontario seemed very easy but, you know." Tr. at 148:13 – 15. The

gravel & shea ATTORNEYS AT LAW
A PROFESSIONAL CORPORATION
76 St. Paul Street
P.O. Box 369
Burlington, Vermont 05402-0369

- 6 -

Court asked only one follow-up question during the direct examination of Mr. Horst, 11 pages later, clarifying whether Mr. Horst had said a.m. or p.m. in response to a question. Tr. at 159:8 – 21.

When Mr. Horst was cross-examined, one of the significant defense themes was that Mr. Horst, like Mr. Zodhiates, drove Lisa Miller from one point to another and did not believe that doing so was in any way illegal or improper. For example, defense counsel asked Mr. Horst, "So you came to the conclusion to drive them within Ontario because you were of the belief that would be appropriate and not illegal for you to do so?" to which Mr. Horst responded "Correct." Tr. at 166:9 – 12. Mr. Horst was also asked "Was it your belief that if there was something that would have restricted or prevented [Lisa and Isabella] from traveling into Canada, that they wouldn't have made it to you successfully?" to which he responded "Yes." Tr. at 167:2 – 5. Mr. Horst also confirmed that the ability of Lisa and Isabella to travel into Canada gave him added reassurance that he wasn't doing anything improper or illegal. Tr. at 167:6 - 14.

Mr. Horst was then asked "Was it your understanding that this person named Philip with whom you had come in contact, was engaging in similar transportation on the other side of the border between Canada and the United States?" Tr. at 173:13-16. Mr. Horst initially responded "I have never given that much thought." Tr. at 173:17. He later agreed with the parallel being drawn by defense counsel responding "Correct" to the question "And this person named Philip to whom you spoke is engaged in similar travel on the U.S. side, correct?" Tr. at 173:25 – 174:2. Mr. Horst went on to confirm that he had no intention to obstruct anyone or break any laws by participating in this transportation. Tr. at 175 – 176.

On redirect, the prosecution asked questions confirming that Mr. Horst had limited information at the time he transported Lisa and Isabella Miller. Tr. at 177 – 178. The

gravel &
shea ATTORNEYS AT LAW
A PROFESSIONAL CORPORATION
76 St. Paul Street
P.O. Box 369
Burlington, Vermont 05402-0369

- 7 -

prosecution asked no questions about why Mr. Horst did not cross the Canadian border. *Id.* Defense counsel then asked two follow-up questions on re-cross, concluding with one that summarized the primary defense theory on cross examination - that Mr. Horst, like Mr. Zodhiates, did not think that driving Lisa Miller from one point to another was in any way wrongful when he did it: "But you were led to believe that as of the 22 of September, 2009, there was no custody or other issue that impeded or prevented your ability to assist them with transportation?" to which he responded "That's correct." Tr. at 179:4 – 8.

The Court then asked a series of questions directly contradicting this theme: "Why didn't you go and - why didn't you pick them up in the United States?" and later following up with "All right. Let me ask then: Why didn't it feel good? What did you feel like, there was something wrong?" to which Mr. Horst responded, "It felt like there might be. There was a better chance of getting repercussions about the matter in the future." Tr. at 179:10 – 23. The Court's questions were asked on page 179 of the transcript, immediately after Mr. Horst was cross-examined, and more than 30 pages after the prosecution asked a single question about Mr. Horst's potential concerns.

In both *Filani* and *Victoria,* the Second Circuit found problematic, among other things, questions asked outside the scope of direct examination that appeared to bolster the case of the prosecution and contradict the case of the defense. *Filani,* 74 F.3d at 381–82 (finding problematic questions asked by the Court during cross-examination of a defendant and following cross examination by the defense of a prosecution witness); *Victoria,* 837 F.2d at 53–54 (finding problematic questions asked by the court after the prosecution chose not to cross-examine a defendant). Counsel respectfully submits that a court on appeal may find the line of questions asked by the Court to be more analogous to the "series of follow-up questions that entirely

gravel &
shea   ATTORNEYS AT LAW
A PROFESSIONAL CORPORATION
76 St. Paul Street
P.O. Box 369
Burlington, Vermont 05402-0369

- 8 -

demolished the helpful concession defense counsel had elicited from a prosecution witness" found problematic in *Filani,* than to a clarifying question, based on their content and timing.

Counsel also submits that a court on appeal may find problematic, either alone or together, the Court's response to the closing arguments of the prosecution and the defense. The Court twice intervened in the closing argument of the defense while defense counsel was discussing variations on the term reasonable doubt to emphasize that it would explain the law. In contrast, during the prosecution closing, the prosecution discussed what law determines parental rights in considerable detail and did so in substantial tension with the definition set forth in *United States v. Amer,* 110 F.3d 873, 878 (2d Cir. 1997). The Court did not interject in that legal discussion and declined to issue a jury instruction rooted in the language of *Amer.*

Counsel respectfully submits that whether the interventions of the Court during the trial were consistent with past Second Circuit precedent is a substantial question of law likely to result in an order for a new trial.

## Conclusion

For the reasons discussed in more detail above, Mr. Zodhiates's appeal raises a series of substantial issues of law that will likely result in reversal or an order for a new trial. In addition, Mr. Zodhiates believes that these issues will likely result in reversal or an order for a new trial, so he is no risk of flight or danger to the community because he continues to believe he will be

gravel &
shea | ATTORNEYS AT LAW
A PROFESSIONAL CORPORATION
76 St. Paul Street
P.O. Box 369
Burlington, Vermont 05402-0369

- 9 -

exonerated. Consequently, this Court should stay any term of imprisonment that he may receive pending appeal.

Dated:    Burlington, Vermont
March 3, 2017

/s/ Robert B. Hemley
Robert B. Hemley, Esq.
David A. Boyd, Esq.
Gravel & Shea PC
76 St. Paul Street, 7th Floor, P.O. Box 369
Burlington, VT 05402-0369
(802) 658-0220
rhemley@gravelshea.com
dboyd@gravelshea.com

/s/ James W. Grable, Jr.
James W. Grable, Jr., Esq.
CONNORS & VILARDO, LLP
1020 Liberty Building
420 Main Street
Buffalo, New York 14202
(716) 852-5533

For Defendant Philip Zodhiates

gravel &
shea ATTORNEYS AT LAW
A PROFESSIONAL CORPORATION
76 St. Paul Street
P.O. Box 369
Burlington, Vermont 05402-0369

- 10 -