UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

PHILIP ZODHIATES,

                Petitioner,

       v.                                   **DECISION AND ORDER**
                                             14-CR-175-RJA

UNITED STATES OF AMERICA,               19-CV-803-RJA

                Respondent.

_____

       *Pro se* petitioner Philip Zodhiates was convicted of both counts of a two-count

Superseding Indictment (Dkt. No. 41), *i.e.*, conspiracy to obstruct parental rights, in

violation of 18 U.S.C. § 371 (Count 1), and international parental kidnapping and

aiding and abetting international parental kidnapping, in violation of 18 U.S.C. §

1204, the International Parental Kidnapping Crime Act (IPKCA), and 18 U.S.C. § 2

(Count 2), following an eight-day jury trial in late September 2016 (Dkt. No. 151 [jury

verdict]).  In short, Zodhiates "was convicted of conspiring with and aiding and

abetting parent [and co-defendant] Lisa Miller to remove her seven-year-old child

from the United States to Nicaragua in order to obstruct the lawful exercise of

parental rights by Miller's civil union partner, Janet Jenkins, in violation of the

[IPKCA]."  (Dkt. No. 203, p. 4 [Second Circuit Mandate]).

       Zodhiates was sentenced on March 22, 2017 to a 36-month aggregate term

of imprisonment, to be followed by 1 year of supervised release.  On March 24,

2017, the Court granted (Dkt. No. 184) Zodhiates's motion to stay his sentencing pending his Second Circuit appeal (Dkt. No. 185 [Notice of Appeal]).  On October 26, 2018, the Second Circuit affirmed Zodhiates's conviction (Dkt. No. 203 [Mandate]; *United States v. Zodhiates* (*Zodhiates III*), 901 F.3d 137, 139-140 (2d Cir. 2018), and he was ordered to self-surrender to the Federal Bureau of Prisons on December 5, 2018 (Dkt. No. 204).  Zodhiates filed a petition for writ of certiorari, which was denied on February 25, 2019.  *See Zodhiates v. United States*, 139 S. Ct. 1273 (2019).

Pending before the Court is Zodhiates's motion (Dkt. No. 209) pursuant to 28 U.S.C. § 2255 ("§ 2255 motion"), filed June 13, 2019, to vacate or reduce his sentence, in which he argues that he received ineffective assistance of trial counsel in violation of the Sixth Amendment to the U.S. Constitution.  *See* Dkt. No. 209, pp. 5, 14.  Zodhiates requests that the Court hold an evidentiary hearing on his motion at which trial counsel could be cross-examined in the event it does not rule in his favor based on the motion papers.  *See* Dkt. No. 226, p. 12.  For the reasons stated below, the motion is DENIED without a hearing.

## **BACKGROUND**

Zodhiates's case arose out of a bitter custody dispute that took place between Lisa Miller and Janet Jenkins over their daughter, "IMJ."  *See United States v. Zodhiates (Zodhiates II)*, 235 F. Supp. 3d 439, 443 (W.D.N.Y. 2017) (Dkt. No. 164 [denying Defendant's Rule 29 and Rule 33 motions]).  Miller and Jenkins, after living together in Virginia for several years, entered into a civil union in Vermont in 2000. *See United States v. Zodhiates (Zodhiates I)*, 166 F. Supp. 3d 328, 331 (W.D.N.Y.

2016) (Dkt. No. 80 [denying Defendant's pretrial motions]).  In 2002, Lisa gave birth to IMJ, who was conceived via artificial insemination.  *Id.*  Miller, Jenkins, and IMJ moved to Vermont in August 2002; just over a year later, Miller and Jenkins separated, and Miller returned to Virginia with IMJ.  *Id.* at 331-332.

In November 2003, Miller petitioned a Vermont family court to dissolve the civil union between herself and Jenkins.  *See Zodhiates I*, 166 F. Supp. 3d at 332. That court, in a temporary restraining order, awarded Miller temporary legal and physical responsibility for IMJ and assigned Jenkins the right to visit IMJ and speak with her daily.  *See id.*  But Miller shortly thereafter began denying Jenkins those visitation and contact rights, and also asked a Virginia state court to establish IMJ's parentage.  *See id.*  At the time, same-sex civil unions were legal in Vermont and illegal in Virginia.  *See*, *e.g.*, *Miller-Jenkins v. Miller-Jenkins*, 912 A.2d 951, 956, 962-963 (Vt. 2006).  The Virginia Court of Appeals ultimately held that Vermont's state courts (rather than Virginia's) had jurisdiction over the custody dispute and ordered Virginia's courts to "grant full faith and credit to the custody and visitation orders of the Vermont court."[1]  *Zodhiates I*, 166 F. Supp. 3d at 332, quoting *Miller-Jenkins v. Miller-Jenkins*, 637 S.E.2d 330, 332 (Va. Ct. App. 2006).

Meanwhile, back in Vermont, the family court found Miller in contempt and found that both Miller and Jenkins had parental interests in IMJ.  *Zodhiates I*, 166 F. Supp. 3d at 332.  The family court, later affirmed by the Vermont Supreme Court,

---

[1] By then, IMJ's case had begun receiving national attention. *See, e.g.*, Adam Liptak, *Parental Rights Upheld for Lesbian Ex-Partner*, N.Y. TIMES (Aug. 5, 2006), https://www.nytimes.com/2006/08/05/us/05gay.html.

3

ordered that physical and legal custody of IMJ would go to Miller, subject to Jenkins's visitation rights, but also warned Miller that the custody order could be modified if she continued to interfere with the relationship between Jenkins and IMJ. *Id.* Miller was held in contempt by the Vermont family court seven more times for violating parent-child contact orders, and in January 2009, the Vermont family court explicitly warned Miller that continued failure to comply with court-ordered visits could lead to a transfer of custody to Jenkins. *Id.*

By that time, Zodhiates had entered the picture. At Zodhiates's trial, the Government presented evidence suggesting that Zodhiates, who owned a direct mail, email, and telemarketing list service that provides marketing services aimed at conservative evangelical Christian organizations, may have become interested in the custody dispute involving Miller, who had renounced homosexuality after the deterioration of her and Jenkins's civil union, because of a bias against homosexuality.[2] *See, e.g.*, Dkt. No. 158 (Trial Tr., Volume III, 9/23/2016), p. 598[3] (one of Zodhiates's employees testified that he sent an email to Zodhiates and others implying that email recipients should pray for Jenkins to "leave the homosexual lifestyle" and for "Lisa's daughter [to] not be[] influenced by Ms. Jenkins'[s] lifestyle").

---

[2] Zodhiates denies that his actions had anything to do with Jenkins's "lifestyle." *See, e.g.*, Dkt. No. 226, p. 9.

[3] The Court refers to page number(s) of the combined trial transcript throughout this Decision and Order.

The evidence introduced at Zodhiates's trial showed that beginning in 2008 and continuing into 2009, Zodhiates became aware of the custody dispute between Miller and Jenkins and received emails about the associated litigation. *Zodhiates II*, 235 F. Supp. 3d at 443. The emails—sent by Miller's supporters and by Liberty Counsel, a law firm representing Miller—provided relatively detailed updates on the status of the litigation. *Id.* Zodhiates sent emails to Liberty Counsel as well, including one January 21, 2009 email introduced by the Government at trial (*see* Gov't Exhibit # 26) that asked whether there was "no legal recourse for Lisa Miller" and followed with, "If not, I'd like to suggest to her some personal options which [Liberty Counsel] probably should not or would not want to know about."[4] *See* Dkt. No. 157 (Trial Tr., Volume II, 9/22/2016), pp. 382-385.

As September 2009 approached, it appeared increasingly likely to those following the custody litigation that Vermont family court Judge William Cohen, who was presiding over the dispute, would transfer custody of IMJ from Miller to Jenkins. *Zodhiates II*, 235 F. Supp. 3d at 444. In early September of 2009, Judge Cohen deferred ruling on Jenkins's motion to transfer custody and instead ordered a visit between Jenkins and IMJ for the end of September. *Id.* Zodhiates learned of that development by way of email. *Id.*

Just days before the court-ordered visit between Jenkins and IMJ was to take place, on September 21, 2009, Zodhiates drove Miller and IMJ from their home in

---

[4] Zodhiates now claims that this email "pertained to a fundraising endeavor" and "had nothing to do with the way it was interpreted." Dkt. No. 254, p. 10.

Virginia to Buffalo, New York. *Zodhiates II*, 235 F. Supp. 3d at 444. Miller and IMJ, dressed as Christian Mennonites, then took a taxi to Niagara Falls, Ontario and were subsequently driven to Toronto. *Id.* From Toronto, Miller and IMJ took the first in a series of flights that concluded in Managua, Nicaragua.[5] *Id.* The Government's evidence showed that Zodhiates spoke at least twice by phone with "an individual in Canada who had agreed to help transport" Miller into Canada. *See Zodhiates I*, 166 F. Supp. 3d at 332.

In November 2009—after Miller and IMJ had already left the United States— "the Vermont family court concluded that Miller had willfully interfered with Jenkins'[s] visitation rights, and it transferred legal and physical rights and responsibilities for [IMJ] to Jenkins as of January 1, 2010." *Jenkins v. Miller*, 983 F. Supp. 2d 423, 437 (D. Vt. 2013).

The evidence at Zodhiates's trial also showed that after IMJ's removal from the United States, Zodhiates coordinated with others to remove personal items from Miller's and IMJ's apartment and arranged for an acquaintance to bring two suitcases to Nicaragua that were to be delivered to Miller. *See Zodhiates II*, 235 F. Supp. 3d at 444.

---

[5] Miller was a fugitive in Nicaragua for many years following the return of the original Indictment in September 2014. She was arrested in the Southern District of Florida in January 2021 (after returning to the United States when IMJ had reached 18 years of age). Her case was then removed to the Western District of New York. *See* Dkt. Nos. 260, 319 ¶4.d. Miller was arraigned on February 26, 2021 before Magistrate Judge Roemer, and was remanded to the custody of the U.S. Marshals Service. Dkt. No. 263. On February 16, 2022, Miller pled guilty to Count 2 of the Superseding Indictment (violating the IPKCA), pursuant to Fed. R. Crim. P. 11(c)(1)(C). Dkt. Nos. 318, 319. The Court sentenced Miller on May 24, 2022 to time served, to be followed by 1 year of supervised release (*see* Dkt. Nos. 332, 333), which was consistent with the parties' agreement that an appropriate sentence would be 12 to 18 months (*see* Dkt. No. 319, ¶ 12) considering her time served in pretrial detention.

The main dispute at Zodhiates's trial was whether the Government proved Zodhiates's intent beyond a reasonable doubt. *See Zodhiates II*, 235 F. Supp. 3d at 444. The IPKCA makes it a crime to remove a child from the United States, or to retain a child outside the United States, "with intent to obstruct the lawful exercise of parental rights." 18 U.S.C. § 1204(a). Thus, on the intent element, the Court instructed the jury to determine what Zodhiates knew or intended in regard to Jenkins's parental rights under Vermont law. *See Zodhiates III*, 901 F.3d at 146.

Before the trial began, the Court issued two rulings identifying the parental rights at issue for each count in the Superseding Indictment. *See Zodhiates II*, 235 F. Supp. 3d at 444; *see also* Dkt. Nos. 102, 108. For the conspiracy count, the Court held that the Government could argue to the jury that Zodhiates conspired to retain IMJ outside the United States with the intent of obstructing an anticipated, but not-yet-existing, custody order—that is, the November 2009 order of the Vermont family court transferring custody of IMJ to Jenkins. *See Zodhiates II*, 235 F. Supp. 3d at 444. For the aiding-and-abetting count, the Court held that the Government had to prove that Zodhiates intended to obstruct a court order in effect at the time he helped remove IMJ from the United States; thus, the parental rights at issue for that count were the visitation rights Jenkins had in September 2009. *See id.* at 444-445.

Zodhiates now asserts in various filings of his § 2255 motion[6] that his trial counsel unreasonably failed to advise him that a statutory affirmative defense

---

[6] *Pro se* motions pursuant to 28 U.S.C. § 2255 are generally given a liberal reading "to raise the strongest arguments that they suggest." *Green v. United States*, 260 F.3d 78, 83 (2d Cir. 2001) (internal quotation marks and citation omitted). *See* Dkt. Nos. 209, 216, 217, 218, 225, 226, 254, 257 (Zodhiates's initial motion papers and subsequent papers).

pertaining to fleeing domestic violence was available under the IPKCA, in violation of rights under the Sixth Amendment; Zodhiates also asserts that, had he known about the statutory affirmative defense, he would have testified at trial on his own behalf. *See, e.g.*, Dkt. No. 226, p. 3.  The IPKCA states there is an affirmative defense to international parental kidnapping for defendants who were "fleeing an incidence or pattern of domestic violence." 18 U.S.C. § 1204(c)(2).

Zodhiates further contends he has become aware of "[n]ew" and "compelling" testimony and evidence that "did exist verifying [IMJ]'s abuse by Janet Jenkins," *see* Dkt. No. 209, p. 6, and there is a "reasonable probability" that raising the statutory affirmative defense would have resulted in a different outcome at trial, *see* Dkt. No. 218, p. 5.

Zodhiates's assertions implicate attorney-client communications relevant to his assertions and therefore he effectively waives his privilege of confidentiality with respect to those communications.  *See, e.g.*, *Sparman v. Edwards*, 154 F.3d 51, 52 (2d Cir. 1998) (per curiam).  But the waiver does not waive his attorneys' obligations to otherwise keep Zodhiates's confidences secret.  *See, e.g.*, *Bernstein v. Bernstein Litowitz Berger & Grossmann LLP*, 814 F.3d 132, 145 (2d Cir. 2016).  The Court thus directed that trial counsel's responses to Zodhiates's assertions would be filed under seal.  *See, e.g.*, Dkt. No. 219.  The Court directed (Dkt. Nos. 219, 227) two rounds of filings from trial counsel, who complied with both requests.  *See* Dkt. Nos. 222, 231; *see also Chang v. United States*, 250 F.3d 79, 85 (2d Cir. 2001) (holding that, while "summary dismissal" of the petitioner's § 2255 motion would have been in error, where he claimed ineffective assistance of counsel that "involve[d] off-the-

8

record interactions with his trial counsel [that] therefore could not be determined by examining the motion, files, and records before the district court," dismissal without a full evidentiary hearing was not an abuse of discretion where, "[a]t the request of the court, the record was supplemented by a detailed affidavit from trial counsel credibly describing the circumstances concerning appellant's failure to testify."). The Government also responded twice—the second time under seal—to Zodhiates's assertions. *See* Dkt. Nos. 212, 232.

The Court has carefully considered the parties' and trial counsel's filings in determining Zodhiates's § 2255 motion. *See* Dkt. Nos. 209, 212, 216, 217, 218, 219, 222, 225, 226, 227, 231, 232, 239, 254, 257.

## **DISCUSSION**

Preliminarily, Zodhiates was released from Federal Bureau of Prisons custody on June 24, 2021.[7]  Although Zodhiates has already completed the incarceration portion of his sentence, the Court finds that his § 2255 motion should not be dismissed as moot. *See Pena v. United States*, Civil Case No. 1:13-cv-00947-MAT, Criminal Case No. 1:11-cr-00381-MAT, 2016 WL 7056541, 2016 U.S. Dist. LEXIS 167563, *5 (W.D.N.Y. Dec. 5, 2016) ("A criminal case does not necessarily become moot when the inmate completes his sentence."), citing *United States v. Mercurris*, 192 F.3d 290, 293 (2d Cir. 1999).  "While the Government has not argued that [Zodhiates]'s Section 2255 motion is moot, this Court has 'an independent obligation to ensure that developments in the case have not rendered the [case] moot.'"

---

[7] *See Inmate Locator*, Federal Bureau of Prisons, Philip Zodhiates, 18649-084, https://www.bop.gov/inmateloc/ (last visited Aug. 23, 2022).

*Beaver v. United States*, Civil Case No. 1:11-cv-00818-MAT, Criminal Case No.

1:08-cr-00251-MAT, 2016 WL 6995075, 2016 U.S. Dist. LEXIS 165190, *7-8

(W.D.N.Y. Nov. 30, 2016), quoting *United States v. Williams*, 475 F.3d 468, 479 (2d

Cir. 2007) (citation omitted).

Unlike other § 2255 petitions that courts in the Second Circuit have dismissed

as moot where a defendant's "challenge is solely to the length of his sentence,"

Zodhiates contests his underlying conviction from which collateral consequences

presumably stem.  *Pena*, 2016 U.S. Dist. LEXIS 167563, at *6-7 (W.D.N.Y. Dec. 5,

2016) (denying as moot the petitioner's request for relief under § 2255 where the

petitioner had been released from custody and challenged only the length of his

sentence, as the Court was "foreclosed from presuming the existence of collateral

consequences" in that scenario); *also compare United States v. Hey*, Crim. No.

5:14-cr-28-3, 2016 U.S. Dist. LEXIS 186363, *8-11 (D. Vt. Dec. 12, 2016) (holding

the petitioner's claim was moot "because the two grounds for relief [were] directed

only at the custodial portion of [the petitioner's] sentence, rather than the underlying

conviction," and the Court was unable to shorten her term of supervised release that

she was currently serving as it was required by statute) (collecting cases); *Guzman

v. United States*, 05 Civ. 2691 (RMB)(AJP), 99 Crim. 1036 (RMB), 2007 WL

1821698, 2007 U.S. Dist. LEXIS 45792, *2-4 (S.D.N.Y. June 26, 2007) ("Since the

petition is directed at his sentence not his conviction, and thus there is no 'collateral

consequence,' and since the Court has no way to communicate with the deported

petitioner [who had already served his full sentence], the petition should be

dismissed as moot.") (collecting cases), *adopted by Guzman v. United States*, 2007 WL 2589536, 2007 U.S. Dist. LEXIS 64361 (S.D.N.Y. Aug. 28, 2007).

As such, the Court will determine Zodhiates's motion on the merits.

## I.  Legal Standard

A prisoner in federal custody may move to vacate, set aside, or correct his sentence only "upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such a sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack."  28 U.S.C. § 2255(a). "To prevail under § 2255, a defendant must demonstrate either the existence of a 'constitutional error . . . or an error of law or fact that constitutes a fundamental defect which inherently results in a complete miscarriage of justice.'"  *Donaldson v. United States*, 09-CR-321A, 15-CV-891A, 2018 WL 703102, 2018 U.S. Dist. LEXIS 18668, *4 (W.D.N.Y. Feb. 5, 2018), quoting *United States v. Bokun*, 73 F.3d 8, 12 (2d Cir. 1995) (ellipsis in original).  "Unless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief, the court shall . . . grant a prompt hearing thereon, determine the issues and make findings of fact and conclusions of law with respect thereto."  28 U.S.C. § 2255(b).

However, "a district court need not assume the credibility of factual assertions, as it would in civil cases, where the assertions are contradicted by the record in the underlying proceeding."  *Puglisi v. United States*, 586 F.3d 209, 214 (2d Cir. 2009) (collecting cases); *see also Pham v. United States*, 317 F.3d 178, 184 (2d Cir. 2003) (in determining § 2255 motions, the district court may "decid[e]

disputed facts on the basis of written submissions").  And "[i]f it plainly appears from the motion, any attached exhibits, and the record of prior proceedings that the moving party is not entitled to relief, the judge must dismiss the motion.'"  *Puglisi*, 586 F.3d at 213, quoting Rule 4(b) of the Rules Governing § 2255 Proceedings.

"A defendant is generally permitted to raise an ineffective assistance claim in a collateral attack, even when the claim was not raised on direct appeal . . . unless new counsel represented the defendant on direct appeal and the claim is based solely on the record developed at trial."  *Chang*, 250 F.3d at 84 n.1 (internal quotation marks and citations omitted).

Successful Sixth Amendment ineffective assistance of counsel claims must satisfy both prongs of the two-prong test set forth by the U.S. Supreme Court in *Strickland v. Washington*, 466 U.S. 668, 687 (1984).  *See United States v. Rosemond*, 958 F.3d 111, 121 (2d Cir. 2020).  First, a claimant must show that his counsel's representation "fell below an objective standard of reasonableness (the reasonableness prong)."  *Id.*, quoting *Strickland*, 466 U.S. at 688.  Second, the claimant must show that there was "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different (the actual prejudice prong)."  *Id.*, quoting *Strickland*, 466 U.S. at 694.

To warrant a hearing on his ineffective assistance of counsel claim, a petitioner must show that he may be able to establish at a hearing a *prima facie* case that his Sixth Amendment right to the effective assistance of trial counsel was violated.  *See Puglisi*, 586 F.3d at 213.  "If material facts are in dispute, a hearing should usually be held, and relevant findings of facts made."  *Id.*  But "a district court

need not assume the credibility of factual assertions . . . where the assertions are contradicted by the record in the underlying proceeding." *Id.* at 214.  When, as is the case here, the judge who tried the underlying proceedings also presides over a § 2255 motion, "a full-blown evidentiary hearing may not be necessary." *Raysor v. United States*, 647 F.3d 491, 494 (2d Cir. 2011).  "Finally, the Second Circuit normally 'requires some objective evidence other than defendant's assertions to establish prejudice.'" *Donaldson*, 2018 U.S. Dist. LEXIS 18668, at *4-5, quoting *Pham*, 317 F.3d at 182.

As discussed in detail below, Zodhiates cannot establish that trial counsel's performance was deficient to the extent that it fell "'below an objective standard of reasonableness,' as determined by reference to 'prevailing professional norms.'" *Morales v. United States*, 635 F.3d 39, 43 (2d Cir. 2011), quoting *Strickland*, 466 U.S. at 688.  Nor can he show "a reasonable probability that, but for counsel's [alleged] unprofessional errors, the result of the proceeding would have been different." *Hill v. Lockhart*, 474 U.S. 52, 57 (1985), quoting *Strickland*, 466 U.S. at 694.

## II.   Objective Reasonableness of Trial Counsel's Performance

Zodhiates asserts that he wanted to make the jury aware he believed he was assisting Miller and IMJ flee mental, emotional, and sexual abuse that allegedly had been carried out by Jenkins against IMJ;[8] such abuse falls under the type of

---

[8] Zodhiates also occasionally asserts that he believed Jenkins directed at least one of these forms of abuse against Miller, but he largely justifies his actions in this case by discussing abuse he had thought had been perpetrated against IMJ.  *See generally* Dkt. Nos. 209, 216, 217, 218, 226, 254.

"domestic violence" contemplated by the IPKCA; and he would have more firmly instructed trial counsel to raise the abuse allegations and testified in his own defense had he known about the IPKCA's statutory affirmative defense regarding domestic violence.  *See, e.g.*, Dkt. No. 226, pp. 8-9.  He claims that he "insisted" in communications with his attorneys that he thought his best defense would center on the abuse allegations but was discouraged from making such a defense by counsel, who unreasonably did not tell him the defense was codified in the IPKCA.  *See* Dkt. No. 209, p. 5.  Zodhiates further contends that he recently obtained knowledge about evidence of alleged abuse by Jenkins that existed at the time of his trial, which implicates his counsel's duty to investigate.  *See, e.g.*, *Strickland*, 466 U.S. at 690 (noting that counsel's duty to investigate was the duty at issue in *Strickland*).

For the reasons stated below, Zodhiates's claims are dubious, and even if they are true, he fails to show why his trial counsel's strategy was unreasonable under *Strickland*.

### A.    *Presumption of reasonableness*

Courts scrutinizing the performance of defense counsel in the context of ineffective-assistance-of-counsel claims "are 'highly deferential,' and must 'strongly presume[]' that counsel 'made all significant decisions in the exercise of reasonable professional judgment.'"  *Rosemond*, 958 F.3d at 121, quoting *Strickland*, 466 U.S. at 689-690.  On ineffective-assistance questions concerning trial decisions, courts should "begin with a 'presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'"  *United States v. Nolan*, 956 F.3d 71, 83 (2d Cir. 2020), quoting *Strickland*, 466 U.S. at 689.

14

### 1.  Counsel's (and Zodhiates's) decision to center the defense strategy on Zodhiates's intent

Zodhiates's defense counsel paints a different picture than Zodhiates does of the conversations and understandings between themselves and Zodhiates. Defense counsel contends Zodhiates agreed that counsel should use the strategy that was ultimately employed at trial—a strategy centered on an argument "that Mr. Zodhiates lacked the necessary intent to violate" the IPKCA.  Dkt. No. 222, p. 4.

Assuming, *arguendo*, that the statutory affirmative defense for victims of domestic violence in 18 U.S.C. § 1204(c)(2) would be available to a defendant like Zodhiates,[9] and that the phrase "domestic violence" in the statute should be construed broadly,[10] defense counsel concluded that raising the affirmative defense

---

[9] In other words, counsel assumed, *arguendo*, that the affirmative defense—which, by its terms, excuses a kidnapper who was "fleeing an incidence or pattern of domestic violence," 18 U.S.C. § 1204(c)(2)—would be available to someone who *aids and abets* a kidnapper *whose child* was a victim of domestic violence.  *See* Dkt. No. 231, p. 7 and n.9; *see, e.g.*, *United States v. Malka*, S3 19-CR-497 (NSR) (05)(09), 2022 U.S. Dist. LEXIS 86361, *58 (S.D.N.Y. May 11, 2022) ("[W]ith respect to the second affirmative defense, while the [defendants] seem to contend they were 'rescuing' the Minors from some kind of alleged abuse, the plain statutory language indicates that the affirmative defense solely applies when 'the defendant' himself or herself is 'fleeing an incidence or pattern of domestic violence' with the removed child.") (internal citations omitted).

[10] Zodhiates claims that he believed Jenkins perpetrated mental, emotional, and sexual abuse against IMJ.  *See, e.g.*, Dkt. No. 226, p. 9.  He points to *United States v. Huong Thi Kim Ly*, 798 F. Supp. 2d 467 (E.D.N.Y. 2011), where the district court held that the defendant was sufficiently prejudiced to warrant a new trial where the court had not included a broad definition of "domestic violence" in its supplemental instruction to the jury.  *Id.* at 480-481.  The district court agreed that the defendant's proposed definition of the phrase "domestic violence" in the context of 18 U.S.C. § 1204(c)(2) to include "emotional, sexual, or physical violence" was "legally correct."  *Id.* at 480.  But Zodhiates's proposed construction of the phrase is not settled. In affirming by summary order the district court's grant of a new trial in *Huong Thi Kim Ly*, holding that the district court was correct that it "failed to give the jury appropriate guidance and potentially prejudiced defendant's case" when it simply told the jury to "use its common sense" in defining "domestic violence," the Second Circuit also explained, "[i]t is by no means clear to us that Congress intended by § 1204 to make a spouse's flight from purely emotional abuse (such as, calling one's spouse 'stupid,' for example), unaccompanied by any incidence or threat of physical force, a defense to kidnapping.  Domestic violence must include the use of physical

and thus taking on the associated burden of proving the defense by a
preponderance of the evidence was not worth the risks that such a strategy entailed.
*See* Dkt. No. 231, pp. 8-9; *Outlaw v. City of Hartford*, 884 F.3d 351, 356 (2d Cir.
2018) (noting that affirmative defenses must be proved by a preponderance of the
evidence).  Defense counsel reasoned that raising the affirmative defense would be
tantamount to conceding that Zodhiates acted with intent to obstruct Jenkins's
parental rights—the element of the charged crimes that took center stage at trial and
that the Government was tasked with proving beyond a reasonable doubt.[11]  *See*

---

force and any threats, explicit or implicit, including gestures and psychological means, that
create a reasonable fear of harm in the victim . . . We have no need to rule definitively on the
issue at this time and do not do so.  We urge the district court to request full briefing of the issue
before instructing the jury in the new trial."  *United States v. Ly*, 507 F. App'x 12, 13 and 13 n.1
(2d Cir. 2013) (summary order).

     The Seventh Circuit has addressed the scope of the defense, concluding that even
though the statute does not define "domestic violence," it requires, "rather than abuse more
generally," that the defendant "show *real* domestic violence, not just a belief that violence
occurred."  *United States v. Nixon*, 901 F.3d 918, 919-920 (7th Cir. 2018) (emphasis in original).
The Nixon Court found that "emotional, psychological, or financial abuse" is not tantamount to
"domestic violence."  *Id.* at 920.  It explained, "we could not equate 'violence' with 'abuse'
without converting every child-kidnapping prosecution into a replay of the child-custody
proceedings, in which the defendant would try to relitigate the domestic-relations case by
showing that he or she really should have received custody.  Yet § 1204 is designed to take the
outcome of the domestic-relations case as a given."  *Id.*

     In addressing the IPKCA's statutory affirmative defense of "domestic violence" and that
"the Second Circuit has not squarely addressed the issue" of how to define that term, the
Southern District of New York recently noted the Second Circuit's footnote in *Ly* and its
apparent "skepticism" of defining "domestic violence" to encompass "purely emotional abuse."
*United States v. Helbrans*, S2 19-CR-497 (NSR) (01) (02), 2021 WL 4778525, 2021 U.S. Dist.
LEXIS 196720, *78 (S.D.N.Y. Oct. 12, 2021).  The *Helbrans* Court therefore "follow[ed] the
guidance from the Seventh Circuit, which held that 'domestic violence' refers to 'physical
(including sexual) misconduct' and not 'emotional, psychological, and financial abuse.'"  *Id.* at
*79; *see also Malka*, 2022 U.S. Dist. LEXIS 86361, at *58 (" 'the defense seems to be limited to
'incidence[s] or pattern[s] of domestic violence' that involve *physical (including sexual) abuse*—
not 'emotional, psychological, and financial abuse.' ") (emphasis in original), quoting *Nixon*, 901
F.3d at 919.

[11] On the conspiracy count, the Government had to prove four elements beyond a reasonable
doubt.  First, that two or more persons entered into an unlawful agreement to remove a child
from the United States and to retain that child, who had been in the United States, outside the

Dkt. No. 231, pp. 7-8 ("The affirmative defense comes into play only as a defense to otherwise unlawful behavior, i.e., only when Mr. Zodhiates himself otherwise acted unlawfully.").  Stated more simply, defense counsel's primary strategy was to hold the Government to its burden of proof without giving up any ground or taking on the burden of proving an affirmative defense.

There is proof from Zodhiates himself that he, at least reluctantly, agreed with counsel's preferred strategy.  *See* Dkt. No. 226, pp. 5-6, 10 (explaining that his attorneys mentioned abuse and Zodhiates "abandon[ed] his thoughts on the issue" because he "trusted counsel and was completely unaware of the statut[ory] . . . defense"); *see also Strickland*, 466 U.S. at 691 ("The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions.").  The Court must guard against any impulse to, now that the strategy did not work, allow Zodhiates to benefit from "the distorting effects of hindsight."  *Strickland*, 466 U.S. at 689.

> **2.    Counsel's conclusion that the affirmative defense would have required Zodhiates's testimony and a challenge to Jenkins's sexual orientation and personal beliefs**

Defense counsel concluded that raising the affirmative defense would have required Zodhiates to take the witness stand and testify about his belief that Miller

---

United States with an intent to obstruct the lawful exercise of parental rights.  Second, that Zodhiates knowingly and willfully became a member of the conspiracy.  Third, that one of the members of the conspiracy knowingly committed at least one of the overt acts charged in the indictment.  And fourth, that the overt acts were committed in furtherance of some object of the conspiracy.  *See* Dkt. No. 155, p. 1158.  On the aiding and abetting count, the Government had to prove three elements beyond a reasonable doubt.  First, that IMJ was previously in the United States.  Second, that Zodhiates (or someone else who was aided and abetted by Zodhiates) took IMJ from the United States to another country.  And third, that Zodhiates acted with intent to obstruct the lawful exercise of the parental rights of Jenkins.  *See id.* at pp. 1169-1172.

was fleeing domestic violence, which in turn would have exposed him to potentially damaging cross-examination.  *See* Dkt. No. 231, p. 11.

Defense counsel was also concerned the only way to suggest at trial that Zodhiates believed Jenkins abused IMJ would have been to "challenge her lifestyle, which would have been a futile and likely disastrous approach."  *See* Dkt. No. 231, p. 10.  A mock jury exercise conducted by defense counsel in Buffalo approximately 18 months before trial—an exercise at which the abuse defense was presented to mock jurors—led to counsel's conclusion that Zodhiates's defense should "avoid characterizing homosexuality as a sin" and that "any hint of suggesting that God's law should take priority over man's law would be disastrous."  *Id.* at p. 17; *see also id.* at p. 8 (stating defense counsel's conclusion that the law does "not recognize a lesbian lifestyle as domestic violence"); *id.* at 11 (stating defense counsel's conclusion that the affirmative defense would have led to a "grave risk . . . that the jury would be angered by the effort to suggest abuse and would have taken that anger out on Mr. Zodhiates"); *see also* Dkt. No. 222, p. 8 (where defense counsel first mentions the mock jury exercise in their papers).

Zodhiates argues that he would have testified had he known about the statutory affirmative defense, an assertion that could be read to suggest that counsel did not properly allow Zodhiates to make the important decision whether to testify. But defense counsel contends that after the mock jury exercise, defense counsel advised Zodhiates that if he decided to go to trial, he *should* testify in his own defense to provide himself the best chance at acquittal.  Dkt. No. 231, p. 17. Defense counsel did, as the trial unfolded, eventually advise Zodhiates not to testify

(although explained that the ultimate decision was his own) and instead pursue the strategy of focusing on the "gaps in the Government's case" and questioning whether the Government proved the critical element of intent beyond a reasonable doubt.  Zodhiates expressly agreed, writing to counsel, "I should not testify."  *See id.*, pp. 35-36 (Exhibit B).

### 3.   Counsel's use of character evidence

The struggle before the jury over Zodhiates's intent implicated his motive and his character.  At trial, the Government presented evidence suggesting that Zodhiates may have been motivated to help Miller because of a bias against homosexuality.  Defense counsel argued in summation that motive was different from intent, Zodhiates's personal beliefs were irrelevant, and the Government had failed to prove beyond a reasonable doubt that Zodhiates specifically intended to obstruct Jenkins's parental rights.  *See, e.g.*, Dkt. No. 161 (Trial Tr., Volume VI, 9/28/2016), pp. 1079-1094 (defense summation).  Defense counsel pointed to the complexity of the custody litigation, which took place in two states, as a reason to doubt whether Zodhiates even understood what Jenkins's parental rights were.  *See id.*

Because the Government put Zodhiates's motive at issue, however, and "because the motive may bear on [Zodhiates's] intent," the Court allowed Zodhiates to introduce motive-related evidence of his own—specifically, "evidence of the character trait of unconditional charity and generosity"—on the basis that "generosity and unconditional charity are pertinent to the intent issue in this case."  Dkt. No. 156 (Trial Tr., Volume I, 9/21/2016), p. 3.  For example, the Court stated that if Zodhiates

19

"were to introduce evidence that he gave his material possessions to others who are in need, without regard to whether he disagrees or agrees with the beneficiary's lifestyle or personal beliefs, evidence of the character trait of unconditional charity and generosity would likely be at least minimally probative of whether the defendant was not motivated to act with specific intent to obstruct Janet Jenkins'[s] parental rights."  *Id.*  The Court also allowed testimony that suggested Zodhiates had the character trait of "law-abidingness" as it may be relevant to his "motive and therefore, his intent."  *See, e.g.*, Dkt. No. 155 (Trial Tr., Volume VII, 9/29/2016), p. 1151 (jury charge).  Defense counsel thus introduced character witnesses at trial[12] and argued that Zodhiates, as a generous, charitable, and law-abiding man, did not believe that what he was doing was illegal, may not have known exactly the extent of or reasons for Miller's plans, and simply drove Miller to Buffalo because he was asked to help her—not because he intended to obstruct Jenkins's parental rights.

---

[12] Zodhiates introduced reputation and opinion testimony from several witnesses under Federal Rule of Evidence 405(a).  *See Zodhiates II*, 235 F. Supp. 3d at 451; *see also* CM/ECF Minute Entries, 09/27/2016, 09/28/2016.  The Court also permitted Zodhiates to introduce some evidence of specific instances of his generosity and charity under a reverse Rule 404(b) theory, which applied to "Rule 404(b) evidence offered by Zodhiates, rather than the Government." *Zodhiates II*, 235 F. Supp. 3d at 450; *see also* Fed. R. Evid. 404(b) (allowing the admission of specific-acts evidence to prove, among other things, motive or intent).  When Zodhiates sought to introduce reverse Rule 404(b) specific-acts evidence, he was required to show why such evidence was admissible under Rule 404(b) even though it would be inadmissible under Rule 405(b), because Zodhiates was not indicted on charges that made his character an "essential element." *Zodhiates II*, 235 F. Supp. 3d at 450-451, quoting Fed. R. Evid. 405(b).  Specific-acts evidence that Zodhiates successfully introduced included testimony that his company has a goal of donating 50% of its annual net profits to charity, as well as evidence that he and his wife adopted six children from Central America, but the Court excluded other specific-acts character evidence Zodhiates sought to introduce under the reverse Rule 404(b) theory because the excluded evidence was precluded by Rule 405(b) and was, due to its potential to distract the jury from the issues it was charged with deciding, independently inadmissible under Rule 403. *See id.* at pp. 451-453.

*See, e.g.*, Dkt. No. 161 (Trial Tr., Volume VI, 9/28/2016), pp. 1081-1085 (defense summation).

*Strickland* and its progeny require that the Court presumes at the outset of its ineffective-assistance-of-counsel inquiry that counsel's trial strategy was reasonable. The burden now falls upon Zodhiates to rebut the presumption.

## B. *Zodhiates's claims do not show that defense counsel should have further investigated the abuse.*

First, however, the Court will consider Zodhiates's implication of defense counsel's duty to investigate. The presumption of reasonableness also applies to counsel's decisions pertaining to investigation. *See Strickland*, 466 U.S. at 691. Zodhiates has not supported with any new evidence his claim that additional evidence existed at the time of his trial that could have been used by defense counsel.

Zodhiates asserts that he has become aware of "[n]ew" and "compelling" testimony and evidence that "did exist verifying IMJ's abuse by Janet Jenkins," pointing to affidavits filed in 2007 in Vermont family court during the custody battle that describe strange behavior supposedly exhibited by IMJ after she visited with Jenkins, but do not contain any proof of abuse.[13] *See* Dkt. No. 209, p. 6. But defense counsel's responses to Zodhiates's § 2255 petition make clear that defense counsel was well aware of the allegations made in the affidavits and the role they played in the Vermont family court proceedings. *See, e.g.*, Dkt. No. 231, pp. 9-10

---

[13] In a later filing, Zodhiates also produces newer affidavits that make similar claims—that IMJ behaved differently or strangely following visits with Jenkins—but do not contain any firsthand knowledge of abuse. *See* Dkt. No. 254, pp. 22-27 (Attachments B–D).

(pointing out that the Vermont family court had rejected the allegations and that Miller had no firsthand evidence of abuse).  After considering the parts of the record concerning the abuse allegations that Zodhiates now claims are "[n]ew," the Court finds that counsel and Zodhiates were aware of said allegations at the time Zodhiates agreed, however reluctantly, to pursue the strategy centered on his intent to obstruct Jenkins's parental rights.

Zodhiates also contends that he urged defense counsel to hire a private investigator to examine whether Jenkins engaged in "a pattern of abuse with other alleged victims" and that counsel "failed to investigate."  *See* Dkt. No. 218, p. 16 (Attachment D).  He argues that defense counsel should have secured expert witnesses who could have helped advance the affirmative defense, but he is not specific about who the experts would have been, beyond naming job titles such as "psychologist," and naming a specific social worker who worked with IMJ and recommended in 2007 that IMJ not be required to travel to visit Jenkins during the school year because of IMJ's emotional well-being and the distance between Virginia and Vermont.  *See, e.g.*, Dkt. No. 226, pp. 11-12; Dkt. No. 209, pp. 24-25 ("Affidavit of Gwen Corley, LCSW," dated 9/19/2007).  But the duty to investigate does not "compel defense counsel to investigate comprehensively every lead or possible defense . . . or 'to scour the globe on the off-chance something will turn up.'"  *Greiner v. Wells*, 417 F.3d 305, 321 (2d Cir. 2005), quoting *Rompilla v. Beard*, 545 U.S. 374, 383 (2005).

Defense counsel's submissions show that counsel "made a strategic choice after thoughtful consideration," *Rosemond*, 958 F.3d at 121, quoting *Henry v. Poole*,

409 F.3d 48, 63 (2d Cir. 2005), of a strategy that involved investigating and raising the abuse allegations and made the reasonable choice not to investigate further. *See Strickland*, 466 U.S. at 690-691 ("[S]trategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation.  In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.").

The Court concludes that Zodhiates has not overcome the presumption of the reasonableness of counsel's decisions implicating the duty to investigate the abuse allegations against Jenkins.

**C.** ***Counsel has presented evidence showing Zodhiates was advised of the substance of the statutory defense, and the decision not to invoke the defense did not violate his right to autonomy.***

Before deciding the legal issue of whether Zodhiates has shown or can show that counsel's performance was unreasonable, it is important to note that much of his argument turns on the simple factual question of whether he was advised of the statutory affirmative defense.  Zodhiates's assertions on this front could be construed to implicate another of his Sixth Amendment rights:  the right to autonomy, which, as the Supreme Court explained in *McCoy v. Louisiana*, 138 S. Ct. 1500 (2018), gives defendants exclusive control over certain important aspects of their defenses.  *See, e.g.*, Dkt. No. 226, p. 8 (arguing that had Zodhiates been informed of the affirmative defense, he "would have moved forward with that defense and testified").  However, as outlined below, Zodhiates's defense counsel has produced evidence that Zodhiates was advised of the substance of the statutory

23

affirmative defense in the IPKCA relating to domestic violence, and Zodhiates points to no authority for his apparent assumption that an affirmative defense codified in a statute has an elevated status in a jurisprudential hierarchy that triggers his autonomy right when other defenses do not.

### 1.    Counsel's evidence of advising Zodhiates about the abuse defense

Zodhiates concedes that defense counsel spoke to him about the abuse defense, but he contends that he was never specifically advised that there is a statutory affirmative defense outlined in the IPKCA.  According to Zodhiates, he would not have been so easily persuaded to abandon the strategy of raising the abuse defense had he known such a defense was codified in the statute.  *See, e.g.*, Dkt. No. 226, p.  11.  He also claims that not only would he have testified in his own defense had he known about the statutory affirmative defense, but that others, whose testimony defense counsel supposedly went without in favor of a different strategy, would have been willing to take the stand to assist him, as well.  However, Zodhiates has not been specific about who these witnesses would have been.  *See* Dkt. No. 254, p. 9 ("All witnesses are readily available to give their testimony pertaining to the facts of the case the Court and the Jury did not receive."); Dkt. No. 226, p. 4 (claiming that "he would have testified as to all the information he was told [about the abuse][, a]nd any 'other individuals' would have been willing to do the same").

Zodhiates appears to argue that there is a distinction between a defense that is not written into a statute and a defense that is, apparently contending that it is

particularly egregious for a defense attorney to decline to take advantage of (or tell a client about) a statutory affirmative defense. *See, e.g.*, Dkt. No. 226, p. 5 (arguing that it "makes no sense not to advance the defense built into the statute").

Defense counsel's submissions include a February 5, 2016 email from counsel to Zodhiates rebutting Zodhiates's claim that he was never told about the affirmative defense. *See* Dkt. No. 231, p. 25 (Exhibit A). The email, addressed to Zodhiates, contained an attachment outlining "three affirmative defenses . . . which we may want to assert," and proceeded to state the substance of the 18 U.S.C. § 1204(c)(2) affirmative defense. *See id.*, p. 31. Defense counsel's submissions also show that Zodhiates expressly stated via email on September 24, 2016 that he should not testify at trial. *See id.*, p. 35 (Exhibit B).[14] Zodhiates argues that the February 5, 2016 email "does not mention the term '1204(c)(2).'" Dkt. No. 254, p. 12. But he points to no authority holding that counsel must inform a client whether—and if so, where—an affirmative defense appears in the United States Code to provide constitutionally effective assistance or to allow a defendant to intelligently exercise the right to autonomy.

---

[14] Read together, these two emails also suggest that Zodhiates received and read (or at least had a chance to read) the February 5, 2016 email from defense counsel because that email was sent to the same email address from which Zodhiates sent his September 24, 2016 email. *Compare* Dkt. No. 231, p. 25 (2/5/2016 email) *with* Dkt. No. 231, p. 35 (9/24/2016 email). Indeed, Zodhiates's argument on this front shifted after defense counsel produced copies of the emails. *Compare* Dkt. No. 226, p. 5 (arguing before counsel's production of emails that Zodhiates did not "recall" receiving any email on 2/5/2016 and did not believe that email was actually sent to him), *with* Dkt. No. 254, pp. 6-7, 12 (declining to dispute after production of emails that the February 5, 2016 email was sent, and instead arguing that the email was "clearly originated for counsel" and that the attachments "appear to be clearly for the attorneys" rather than "personalized to [Zodhiates]"). The Court notes that the February 5, 2016 email was addressed principally to Zodhiates and copied to co-counsel, and the body of the email begins with the salutation "Philip." Dkt. No. 231, p. 25.

Because Zodhiates acknowledges that counsel did discuss with him raising the abuse defense and that he went along with counsel's preferred strategy after said discussion, he essentially asks to be granted relief because defense counsel did not say the magic words "1204(c)(2)" or explicitly state that the affirmative defense was codified in the IPKCA. To allow such a technicality to control Zodhiates's case would hold defense attorneys to a standard that elevates form and legalese over substance in their communication with their clients. The Court declines to do so.

### 2.   Zodhiates's right to autonomy

A more specific discussion of Zodhiates's right to autonomy is warranted because he raises the somewhat novel question of whether defense counsel is obligated by the Sixth Amendment to acquiesce to a client's wish to pursue an affirmative defense.

In *McCoy*, the Supreme Court explained that a criminal defendant has an "autonomy right" under the Sixth Amendment to "make fundamental choices about his own defense," even in the face of objections or disagreement from defense counsel. *McCoy*, 138 S. Ct. at 1511. The *McCoy* Court rejected the argument that defense counsel should be allowed to "concede guilt" over a defendant's "intransigent and unambiguous objection" to afford the defendant a better chance at avoiding a death sentence. *Id.* at 1507-1508. The *McCoy* Court also explained that while "[t]rial management is the lawyer's province[,] . . . [s]ome decisions . . . are reserved for the client," including the choice whether or not to "testify in one's own behalf." *Id.* at 1508. Zodhiates has not argued that he was forbidden by counsel to

26

testify in his own defense in spite of his objections, but even if he did, the September 24, 2016 email in which Zodhiates expressly stated he should not testify would defeat the credibility of such a claim.

Defense counsel has autonomy as well, according to the *McCoy* Court. Again, defense counsel's autonomy extends to decisions related to "[t]rial management."  138 S. Ct. at 1508.  The *McCoy* decision thus led to questions about the precise boundary between the client's and counsel's respective autonomy rights. *See, e.g.*, *Rosemond*, 958 F.3d at 123 (noting post-*McCoy* appellate decisions). The Second Circuit clarified in *Rosemond* that *McCoy*'s holding about the defendant's right to assert innocence "is limited to a defendant's right to maintain his innocence of the *charged* crimes."  *Id.* (emphasis added).  The *Rosemond* panel held that it was permissible for a defense attorney at trial to concede one element of the crime with which the defendant was charged, even though the conceded activity itself constituted another crime.  *Id.* at 122-123.

A decision whether to invoke the 18 U.S.C. § 1204(c)(2) affirmative defense falls somewhere between the choices in *McCoy* (whether to assert innocence of the charged crime) and *Rosemond* (whether to concede an element of the charged crime), but the Court concludes it is closer to the choice set forth in *Rosemond*. Even if Zodhiates could establish, or could plausibly claim that a hearing would help him establish, that defense counsel refused to raise the affirmative defense despite Zodhiates's requests that counsel do so—and, to be clear, Zodhiates has not made such a showing—the decision whether to invoke or decline to invoke a statutory affirmative defense falls within the category of choices about "[t]rial management"

27

that defense counsel can autonomously make under the *McCoy* doctrine, as clarified in *Rosemond*. *See Gordon v. Lavalley*, 13 Civ. 4401 (ALC) (AJP), 2014 WL 888468, 2014 U.S. Dist. LEXIS 30013, *62-63 (S.D.N.Y. Mar. 6, 2014) ("The decision whether to assert an affirmative defense is a matter of trial strategy that generally will not be second-guessed by a reviewing court . . . This is especially true when the affirmative defense potentially would undermine the defense offered at trial . . .") (collecting cases), *adopted by Gordon v. Lavalley*, 13-CV-4401 (ALC), 2016 WL 5793400, 2016 U.S. Dist. LEXIS 137252 (S.D.N.Y. Oct. 3, 2016).

The *McCoy* Court distinguished between "strategic choices about how best to *achieve* a client's objectives" and "choices about what the client's objectives in fact *are*," holding that choices in the former category can be made by counsel while decisions in the latter category are "reserved for the client." *McCoy*, 138 S. Ct. at 1508 (emphases in original). Zodhiates's objective was acquittal, and the decision whether to invoke the statutory affirmative defense—like the decision in *Rosemond* whether to concede an element of the charged crime—was a choice about how best to achieve such an acquittal.

If defense counsel had truly refused Zodhiates's request to raise the statutory affirmative defense, it could be argued that Zodhiates was not merely making a request about trial management but invoking his right under *McCoy* to maintain his innocence, as a successful affirmative defense would result in acquittal. But to hold that defense counsel must abide by such a request—even if, in counsel's reasonable professional judgment, another strategy objectively provides much better odds at acquittal—would put counsel in a double bind because to not raise the

objectively better defense would constitute ineffective assistance of counsel. Moreover, in *McCoy*, defense counsel conceded guilt over the defendant's objection—a decision that, once made and carried out, removed the question of guilt or innocence from the issues being contested.  Here, the decision not to invoke the affirmative defense did not concede any such thing.  There was more than one way to assert Zodhiates's innocence, and defense counsel used professional judgment to choose one of them.

In any event, Zodhiates has not actually asserted that he urged his attorneys to invoke the statutory affirmative defense and that counsel ignored or refused his request; he instead claims he was never told about the statutory affirmative defense. The record reveals that he was told about the substance of the statutory affirmative defense.  As for whether Zodhiates had an autonomy right to be apprised of not only the substance of the affirmative defense but also of the fact that it was codified in the IPKCA, nothing in *McCoy* or *Rosemond* supports such a proposition.  Thus, any right-to-autonomy claim suggested by Zodhiates's § 2255 filings fail.

### D. *Zodhiates has not overcome the presumption of reasonableness.*

The presumption under *Strickland* of counsel's reasonable performance and trial strategy is only overcome if counsel "failed to act reasonably considering all of the circumstances"; courts must consider counsel's perspective at the time decisions were made.  *Rosemond*, 958 F.3d at 121.  If counsel "made a strategic choice after thoughtful consideration, that decision will be 'virtually unchallengeable.'"  *Id.*, quoting *Henry*, 409 F.3d at 63.

29

Decisions about affirmative defenses are decisions pertaining to trial strategy. *See Gee v. Conway*, 664 F. Supp. 2d 225, 232-233 (W.D.N.Y. 2009) (finding that trial counsel's failure to request an affirmative defense charge was a decision about trial strategy and did not constitute ineffective assistance of counsel); *see also Gordon*, 2014 U.S. Dist. LEXIS 30013, at *62-63; *Smith v. Green*, 05 Civ. 7849(DC), 2006 WL 1997476, 2006 U.S. Dist. LEXIS 49120, *36-37 (S.D.N.Y. July 17, 2006) (finding defense counsel's choice to not assert an affirmative defense was reasonable where there "little, if any, evidentiary basis" for the defense, and noting that "[t]he decision to forgo an unsupported argument is not ineffective assistance.").

Zodhiates does not give specific reasons in his § 2255 filings why defense counsel's strategy was unreasonable; he only asserts in a conclusory way that it "simply did not make sense" and "the failed strategy . . . presented at trial was not the best strategy," and counsel should have made the affirmative defense at trial. *See, e.g.*, Dkt. No. 226, pp. 7-8. Zodhiates's conclusory statements do not rebut the presumption of reasonableness. He essentially asks the Court to "second guess matters of trial strategy simply because the chosen strategy was not successful," *Trapnell v. United States*, 725 F.2d 149, 155 (2d Cir. 1983), but the *Strickland* regime strictly forbids doing so. Indeed, "a court may not use hindsight to second-guess counsel's tactical choices." *McKee v. United States*, 167 F.3d 103, 106 (2d Cir. 1999) (internal quotation marks and citations omitted). Zodhiates's complaint that his counsel's strategy was not "the best strategy," even if true, would afford him no relief. *Strickland* only requires that defendants be afforded "reasonably effective assistance." *See Strickland*, 466 U.S. at 687, 689 (stating that the "purpose of the

effective assistance guarantee of the Sixth Amendment is not to improve the quality of legal representation" but is "simply to ensure that criminal defendants receive a fair trial"); *United States v. Aguirre*, 912 F.2d 555 (2d Cir. 1990) ("The court 'must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance,' bearing in mind that 'there are countless ways to provide effective assistance in any given case' and that 'even the best criminal defense attorneys would not defend a particular client in the same way.'"), quoting *Strickland*, 466 U.S. at 689.

Even if Zodhiates could show that his preferred strategy of raising the statutory affirmative defense would have been a better strategy than the one counsel used, such a showing, without more, is inadequate to satisfy the first prong of the *Strickland* test.  Rather, Zodhiates would need to demonstrate either why counsel's choice to forgo the affirmative defense fell outside what *Strickland* calls the "wide range of reasonable professional assistance" or why counsel's performance was unreasonable "under prevailing professional norms."  *Strickland*, 466 U.S. at 688-689.

The Court concludes that defense counsel's strategy was, in fact, eminently reasonable.  The Government suggests in its second filing that it would have opposed any effort by defense counsel to argue both the affirmative defense and the intent defense, bolstering defense counsel's conclusion that mounting the affirmative defense would have been tantamount to conceding the intent element.  *See* Dkt. No. 232, p. 19.  The Government also suggests that it would have opposed any attempt by defense counsel to argue that Jenkins's sexual orientation adversely impacted

IMJ, arguing that defense counsel "rightly avoided this sort of dispute with the [G]overnment."  *Id.* at p. 20.

The Government also asserts that had Zodhiates testified, he "would have had to admit to travelling with Lisa Miller to Canada, potentially weakening the defense['s] Fourth Amendment claim."[15]  Dkt. No. 232, p. 21.  The Government additionally argues that Zodhiates would have also had to admit "his understanding of Ms. Jenkins'[s] parental rights, undermining the intent defense"; that his testimony could have adversely impacted his sentencing exposure (should the Court determine an enhancement for obstruction-of-justice applied based on false testimony by Zodhiates); and that he "would have had to testify about other coconspirators" despite his wish not to do so.  *Id.* at pp. 21-22.  Faced with such obstacles and the additional problem that the affirmative defense would have shifted the burden of proof to Zodhiates, defense counsel chose to avoid those hurdles and instead hold the Government to its own burden on the intent issue—a decision that, given this record, cannot be declared unreasonable.

In sum, Zodhiates has not shown that any of counsel's actions were unreasonable or otherwise violative of his Sixth Amendment rights.  Zodhiates also cannot plausibly claim on this record that a hearing would afford him the ability to show that his counsel's efforts fell below an objective standard of reasonableness.  *See Strickland*, 466 U.S. at 688; *Puglisi*, 86 F.3d at 213; *see*, *e.g.*, *Chang*, 250 F.3d at 84, 86 (where the district court dismissed the § 2255 petition on the ground that

---

[15] Zodhiates attempted to suppress cell site location evidence pursuant to the Fourth Amendment but was ultimately unsuccessful.  *See Zodhiates III*, 901 F.3d at 143-144.

the petitioner had failed to establish a deficiency in representation, "[t]he district court reasonably decided that the testimony of [the petitioner] and his trial counsel would add little or nothing to the written submissions . . . having tried the case, [the trial court judge] was intimately familiar with the trial proceedings and the events and circumstances surrounding them.  It was within the court's discretion to determine that more was not needed.").  Zodhiates's § 2255 petition therefore fails on the first prong of the *Strickland* analysis.

**III.**   **Actual Prejudice to Zodhiates from Trial Counsel's Performance**

Zodhiates's claim likewise fails on *Strickland*'s second prong, which requires an ineffective-assistance-of-counsel claimant to show that he or she was prejudiced by counsel's alleged errors.  "When a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the fact finder would have had a reasonable doubt respecting guilt."  *Strickland*, 466 U.S. at 695.  "A reasonable probability is a probability sufficient to undermine confidence in the outcome."  *Id.* at 694.

Defense counsel concluded that the affirmative defense (if permitted by the Court) "would have been a long shot," Dkt. No. 231, p. 18, and Zodhiates's conclusory statements to the contrary are not sufficient to afford him a hearing.  For the reasons set forth below, he has not plausibly argued that evidence in his possession or that could be potentially obtained via a hearing would establish a reasonable probability that the affirmative defense would have been successful.

**A.**  ***Zodhiates's character evidence may not have been admissible had he invoked the affirmative defense.***

Zodhiates asserts that character evidence relating to his generosity would still have been admissible if he had mounted the affirmative defense.  *See* Dkt. No. 226, pp. 7-8 (arguing that "it has always been [Zodhiates]'s character trait to help people in need and in abusive situations").  But the Court allowed character evidence because it could have been "at least minimally probative of whether [Zodhiates] was not motivated to act with specific intent to obstruct Janet Jenkins'[s] parental rights." Dkt. No. 156, p. 3 (Trial Tr., Volume I, 9/21/2016).  Defense counsel used the character evidence accordingly, seeking to challenge the Government's ability to establish the intent element beyond a reasonable doubt.  To use character evidence to establish yet another motive—that Zodhiates acted in accordance with his generous character to help IMJ and Miller flee alleged abuse—would stray from the reason the Court allowed character evidence in the first instance, as such use of the character evidence would say little, if anything, about whether Zodhiates, in the process of helping IMJ and Miller flee the alleged abuse, intended to obstruct Jenkins's parental rights.[16]

Moreover, had defense counsel tried (in addition to using the character evidence as instructed) to introduce character evidence to additionally show that

---

[16] To use specific-acts character evidence would be to stray further afield, as Zodhiates's character would not have been "an essential element" of the affirmative defense.  *See* Fed. R. Evid. 405(b) (allowing specific-acts evidence when character is "an essential element of a charge, claim, or defense"); *see also United States v. Quattrone*, 441 F.3d 153, 191 (2d Cir. 2006) (stating that Rule 404(b) specific-acts evidence introduced by the defense "must serve a non-propensity purpose").

Zodhiates was also motivated by his belief that Jenkins was abusing IMJ, the Court may not have allowed such a dual strategy. *See* Fed. R. Evid. 403 (allowing courts to "exclude relevant evidence if its probative value is substantially outweighed by a danger of," among other things, "confusing the issues"); *see also Clark v. Arizona*, 548 U.S. 735, 769-770 (2006) (stating that a defendant has a due process right to present evidence favorable to himself on an element that must be proven to convict him, but "the right . . . can be curtailed if there is a good reason for doing that"); *United States v. Scheffer*, 523 U.S. 303, 308 (1998) (stating that a "defendant's right to present relevant evidence is not unlimited"); *United States v. Abel*, 469 U.S. 45, 54 (1984) (stating district courts have "wide discretion in determining the admissibility of evidence").[17]

---

[17] Allowing defense counsel to attempt to confuse the jury on the issues of motive (which is not one of the elements of the IPKCA) and intent (which is) may have been akin to allowing defense counsel to argue for jury nullification. Stated differently, the proposition that Zodhiates did not intend to obstruct Jenkins's parental rights because he was motivated by his belief that Jenkins abused IMJ is a non sequitur, *i.e.*, "an inference that does not follow from the premises." *Dictionary: non sequitur*, Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/non%20sequitur (last visited Aug. 23, 2022). And district courts are not "free to permit jury nullification arguments whenever they feel justice so requires." *In re United States*, 945 F.3d 616, 626 (2d Cir. 2019); *see Vilar v. United States*, No. 17-cv-1491 (RJS); No. 05-cr-621 (RJS), 2019 WL 3537052, 2019 U.S. Dist. LEXIS 129501, *17 (S.D.N.Y. Aug. 2, 2019) ("[W]hen directed at the jury, the contract 'defense' [that the petitioner argued trial counsel failed to develop at trial] amounts to an argument for jury nullification. Needless to say, in light of the Second Circuit's 'categorical[] reject[ion]' of 'the idea that, in a society committed to the rule of law, jury nullification is desirable or that courts may permit it to occur when it is within their authority to prevent,' defense counsel's decision not to argue more vigorously for jury nullification cannot constitute ineffective assistance of counsel"), quoting *United States v. Thomas*, 116 F.3d 606, 614 (2d Cir. 2007). Even if the Court would have allowed such a strategy, *Strickland* forbids an assumption that the jury would have been persuaded by it. "In making the determination whether the specified errors resulted in the required prejudice, a court should presume . . . that the judge or jury acted according to law. An assessment of the likelihood of a result more favorable to the defendant must exclude the possibility of arbitrariness, whimsy, caprice, 'nullification,' and the like." *Strickland*, 466 U.S. at 694-695.

Evidence of alleged abuse thus may not have been deemed admissible by the Court if offered in addition to the intent defense evidence. *See*, *e.g.*, *Palmer v. United States*, 11 Civ. 8187 (JSR) (JCF), 05 Cr. 0538 (JSR), 2014 U.S. Dist. LEXIS 42489, *2, 15-16 (S.D.N.Y. Mar. 28, 2014) (where the petitioner argued that "trial counsel provided ineffective assistance by failing to argue certain possible defenses during summation," the Court rejected that argument and found instead that "arguing the alternative and inconsistent defense . . . would have been a dangerous trial strategy.") (collecting cases), *adopted by Palmer v. United States*, 11-cv-8187 (JSR) (JCF), 05-cr-538 (JSR), 2014 WL 6863492, 2014 U.S. Dist. LEXIS 168981 (S.D.N.Y. Dec. 5, 2014).

Zodhiates nevertheless persists in his argument that he could have simultaneously raised the affirmative defense and contested the intent element. *See, e.g.*, Dkt. No. 254, p. 7 (arguing that he "simply believ[ed] a mother and her child . . . were experiencing sexual, mental, and emotional abuse[, a]nd a Jury would [have] share[d] this same view," and thus would have acquitted him based what he calls the "elements of intent" in the statutory affirmative defense regarding domestic violence). He attempts to support that claim by pointing to a passage from an Eastern District of New York decision that reads, "It is well-settled that 'the *mens rea* elements of knowledge and intent can often be proved through circumstantial evidence and the reasonable inferences drawn therefrom.'" *Huong Thi Kim Ly*, 798 F. Supp. 2d at 473, quoting *United States v. MacPherson*, 424 F.3d 183, 189 (2d Cir. 2005), *aff'd by United States v. Ly*, 507 Fed. Appx. 12 (2d Cir. 2013) (summary order); *see* Dkt. No. 226, p. 12. But that general proposition was stated within the

district court's discussion of the defendant's Rule 29 motion for a judgment of acquittal, and the court's conclusion that the Government had presented enough evidence at trial from which the jury could draw reasonable inferences regarding the defendant's intent.  *See Huong Thi Kim Ly*, 798 F. Supp. 2d at 472-474.  In other words, the district court was not citing that proposition in discussing a defendant's right to make an affirmative defense.

Zodhiates additionally asserts that it is inconsequential for the purposes of the affirmative defense whether abuse actually occurred, as long as he believed he was helping Miller and IMJ flee abuse.  *See* Dkt. No. 218 at 3.  The judge's instructions to the jury in *Huong Thi Kim Ly* regarding the 18 U.S.C. § 1204(c)(2) affirmative defense are instructive and run contrary to that argument.  They suggest that a defendant *does* have a duty to prove that abuse truly took place, rather than simply show he had the intent or motive to help someone flee what he believed was abuse regardless of whether the belief was accurate or even reasonable.  *See Huong Thi Kim Ly*, 798 F. Supp. 2d at 479 ("I instruct you that it is a defense to the charge in the indictment that the defendant was fleeing an incidence or pattern of domestic violence *if the defendant proves that this was the case* by a preponderance of the evidence.") (emphasis added).[18]  The Government appears to take that position as well.  *See* Dkt. No. 232, pp. 22-23 ("The statute does not include in the affirmative

---

[18] The defendant in *Huong Thi Kim Ly* successfully challenged the jury instructions on the ground that she was prejudiced by the court's failure to adequately supplement to its definition of "domestic violence" to the jury.  *See Huong Thi Kim Ly*, 798 F. Supp. 2d at 479-481.  But, unlike Zodhiates, the defendant in that case did not argue she had no obligation to prove "domestic violence" (by whatever definition) indeed took place.

defense anything about the good faith of an aider and abettor or a coconspirator. There is no case law dealing with this unusual issue, but the plain language of the statute appears to require a defendant to prove that [the] person fleeing had in fact suffered domestic violence.").

Zodhiates has thus not shown that his attorneys were incorrect when they reasoned that mounting the affirmative defense would have been tantamount to conceding that Zodhiates intended to obstruct Jenkins's parental rights, and even if their decision was incorrect, it "falls within the realm of sound trial strategy and therefore does not support [Zodhiates]'s claim of ineffective assistance." *Palmer*, 2014 U.S. Dist. LEXIS 42489, at *15. Whether utilizing the affirmative defense would have resulted in such a concession, the record of Zodhiates's trial shows that the Court's rulings on character evidence shaped counsel's strategy and limited the extent any evidence of abuse may have been admissible under such a strategy, potentially foreclosing as a practical matter the opportunity to mount the affirmative defense while also contesting the intent element.

### B. *The evidence of alleged abuse was weak and possibly inadmissible.*

As outlined above, Zodhiates has not shown that there is any additional evidence of alleged abuse that he could have used at trial and was not known to him and his attorneys at the time of the trial. As for the evidence of alleged abuse that counsel and Zodhiates did know about at the time, Zodhiates repeatedly asserts that it would have been admissible at trial. *See, e.g.*, Dkt. No. 226, p. 9. Defense counsel arrived at the opposite conclusion. *See* Dkt. No. 231, p. 10 ("We

determined that there was no admissible evidence to prove these essential elements [of the affirmative defense], and explained our reasoning to Mr. Zodhiates.  Mr. Zodhiates agreed with our analysis.").  Defense counsel also concluded that if Zodhiates raised the affirmative defense and necessarily testified (and in their judgment he would have had to do so), the Government would have responded by offering evidence of Zodhiates's views about homosexuality.  Such a tactic on the part of the Government would have not only been "to undermine the use of the affirmative defense, but also to introduce religious and social concepts that likely would have offended jurors and increase[d] the risk of a negative outcome."  *Id.* at p. 14.

The Government suggests in its second filing that it would have opposed the introduction of any evidence relating to Miller's statements about alleged abuse. *See* Dkt. No. 232, p. 20.  The Government also argues that had Zodhiates taken the stand to assert the affirmative defense and present his own testimony as evidence, the Government would have on cross-examination "confronted Zodhiates directly with the email evidence showing that he reached out to Lisa Miller with the intention of helping her in a way that her lawyers should not be aware."  *Id.* at pp. 23-24.  The Government also points to "[o]ther emails expos[ing] the anti-gay motivations driving both Zodhiates and Miller" and to evidence rebutting the allegations of abuse, including that the Vermont family court and the Virginia Department of Child Welfare had concluded the abuse allegations were unsupported and unfounded.  *Id.* at pp. 22, 24.

As argued by the Government, *see* Dkt. No. 232, p. 24, Zodhiates is unpersuasive in his position that it is likely a jury would credit his testimony, due to the evidence tending to weaken the abuse allegations.

### C.   *A mistake-of-fact defense would not probably have succeeded.*

Finally, Zodhiates argues, as mentioned above, that whether abuse was actually perpetrated is immaterial as he believed that he was helping Miller and IMJ flee abuse.[19]  Dkt. No. 218, p. 3.  Zodhiates relies upon the unpublished opinion *United States v. McClennon*, No. 92-1049, 1993 WL 213829, 1993 U.S. App. LEXIS 14792, *2-5 (10th Cir. June 11, 1993) (holding that where a defendant convicted of being a felon in possession of a firearm who claimed he was defending his brother-in-law during a fight, the district court's jury instructions were adequate and correctly stated the law where they indicated that even if the defendant's assessment of the risk to his brother-in-law was wrong, "defendant could still claim defense of another if his perceptions were within normal bounds").

Zodhiates's citation to *McClennon* may seek to raise a mistake-of-fact defense[20]—in other words, a defense that even if Zodhiates was mistaken about

---

[19] Defense counsel asserts that "[it] is an open question as to whether the statute requires proof that there actually had been abuse, which is the literal reading of 1204(c), or whether it would be sufficient for someone like Mr. Zodhiates to have come to the belief, right or wrong, that there was abuse and act accordingly.  What is certain is that the Government would have taken the position that proof of abuse was required.  We have not seen any authority that resolves this question."  Dkt. No. 231, p. 5 n.5.

[20] *See, e.g.*, *United States v. Bronx Reptiles, Inc.*, 217 F.3d 82, 88 n.5 (2d Cir. 2000) ("A defendant's ignorance of a fact in connection with an asserted criminal offense . . . may of course be an 'excuse.'"), quoting *Staples v. United States*, 511 U.S. 600 (1994), which held "that knowledge that a firearm possessed characteristics making it a machine gun was required for conviction."

whether Jenkins abused IMJ, the critical consideration is his good-faith belief in in

Miller's assertion to him that Jenkins had abused IMJ.  *See* Dkt. No. 226, p. 10

(stating that Zodhiates "simply believed what he was told by [Lisa Miller]" regarding

the abuse, and his motive was to help "free" Miller and IMJ from that abuse).  Even

assuming, *arguendo*, that *McClennon*, an unpublished and out-of-Circuit decision

that is not controlling and appears inapplicable, applies in this case (and the Court

does not conclude that it does), *McClennon* held that a defendant could assert his

"defense of another person" to excuse his unlawful actions as long as "his

perceptions were within normal bounds."  *McClennon*, 1993 U.S. App. LEXIS 14792,

at *5.  Zodhiates does not show, or even address, why his belief in the abuse was

"within normal bounds" in light of the aforementioned evidence that the abuse

allegations were baseless, the Vermont family court agreed with that conclusion,

and Zodhiates closely followed Jenkins's custody proceedings in that court.  He thus

cannot show a "reasonable probability" that such a defense, if it would have even

been permitted by the Court, would have been successful.

The Government suggests it would have taken the position that a mistake

defense was not available to Zodhiates.  *See* Dkt. No. 232, p. 23.  But the Court

need not decide what the IPKCA affirmative defense requires, because there is no

reason to conclude that a jury would have disregarded findings of official bodies that

the abuse allegations were unfounded and instead sided with Zodhiates upon mere

hearsay.  Indeed, Zodhiates has not even attempted to explain how he would have

grappled with the evidence from Virginia and Vermont rebutting the allegations of

abuse.

For the reasons outlined above, Zodhiates has not shown beyond his conclusory statements that, had he presented the affirmative defense at trial, there would have been a "reasonable probability" that "the fact finder would have had a reasonable doubt respecting guilt." *Strickland*, 466 U.S. at 695. On *Strickland*'s second prong, then, as on its first, Zodhiates's ineffective-assistance-of-counsel claim is unsuccessful. Moreover, Zodhiates cannot plausibly claim he could establish at a hearing a *prima facie* case that he received constitutionally ineffective assistance of trial counsel.

## CONCLUSION

For the reasons stated above, Zodhiates's motion (Dkt. No. 209) pursuant to 28 U.S.C. § 2255 to vacate or reduce his sentence is DENIED, as is his alternative request for a hearing. Furthermore, pursuant to 28 U.S.C. § 2253(c)(1) and Rule 11(a) of the Rules Governing Section 2255 Proceedings, the Court declines to issue a certificate of appealability because Zodhiates has not made a substantial showing of the denial of a constitutional right. Finally, the Court certifies, pursuant to 28 U.S.C. § 1915(a)(3), that any appeal taken from this decision would not be taken in good faith. Thus, leave to appeal *in forma pauperis* is denied. Zodhiates is advised that "Federal Rule of Appellate Procedure 4(a) governs the time to appeal," and "[a] timely notice of appeal must be filed even" though the Court declined to issue a certificate of appealability. Rule 11(b) of the Rules Governing Section 2255 Proceedings.

The Clerk of Court shall take all steps necessary to close the parallel civil action, 19-CV-803-RJA.

**SO ORDERED.**

*s/Richard J. Arcara*
_____
HONORABLE RICHARD J.  ARCARA
UNITED STATES DISTRICT JUDGE

Dated:  August 23, 2022
        Buffalo, New York